**William J. KLEIN, Plaintiff–Appellant,**

v.

**Lawrence RYAN and Frank Lombardo, Defendants–Appellees.**

No. 87–2554.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1988.

Decided May 16, 1988.

Robert M. Hodge, Chicago, Ill., for plaintiff-appellant.

John B. Murphey, Rosenthal, Murphey, Coblentz & Janega, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff Klein brought this action against defendants Ryan and Lombardo under 42 U.S.C. § 1983. Klein claims that the defendants violated his fourth and fourteenth amendment rights when they shot Klein as he was fleeing after committing a burglary. The district court granted the defendants' motion for summary judgment based upon their affirmative defense of qualified immunity. We affirm.

## I. FACTUAL BACKGROUND

In April 1983, the owner of Family Pride Laundromat, located at 495 Roosevelt Road, Glen Ellyn, Illinois, complained to the Glen Ellyn Police Department that someone was taking money from the laundromat. Through the aid of photographic surveillance, the police determined that the man breaking into the laundromat was plaintiff William Klein. As part of their investigation, the Glen Ellyn police periodically placed the laundromat under surveillance.

Defendant Lawrence Ryan, a police officer with the Village of Glen Ellyn, participated in the laundromat investigation. During the course of his investigation, and prior to May 12, 1983, Ryan had been advised by a police officer in West Chicago that on an earlier occasion when Klein had been arrested in that city, he had been carrying a gun. Ryan had attempted to locate Klein from an address that Klein had given on previous arrests in the Village of Mount Prospect, but the address was fictitious.

Ryan and defendant Frank Lombardo, an auxiliary police officer with the Glen Ellyn Police Department, were assigned to the evening shift on May 12, 1983. At the beginning of that shift, the shift commander briefed the officers on the proposed stakeout of Family Pride Laundromat. In the course of the briefing, the shift commander told the officers of a prior incident where Klein had attempted to run someone over with an automobile.

Around 11:00 p.m. that evening, Ryan and his partner, Mark Tobias, checked on the laundromat and found the back door propped open with a rock. They closed the door and drove east on Roosevelt Road. As the policemen were driving away from the laundromat, they observed Klein a few feet away in another vehicle. Ryan recog-

nized Klein from the surveillance photos taken at the laundromat in April.

Ryan and Tobias parked across the street south of the laundromat. Klein parked his car in the parking lot south of the laundromat, with his car facing west. Ryan observed Klein walk along the west side of the laundromat to the front (north) door, carrying a container. Klein opened the front door and entered the laundromat. After Ryan observed Klein remove coin boxes from the dryers, Ryan radioed for assistance.

While Klein was still inside, Ryan walked to the west wall of the laundromat and watched Klein through a window. Ryan did not bring his police radio with him.

In response to Ryan's request for assistance, Lombardo was assigned to go to the front entrance of the laundromat, in accordance with the original plan that the briefing officer had outlined. En route to the laundromat, Lombardo learned that Klein was parked in the rear of the building, necessitating a change in the plan. Upon arriving at the laundromat, Lombardo left his squad car and positioned himself behind a dumpster located in the rear parking lot of Arby's, a restaurant directly east of Family Pride Laundromat. Lombardo was armed with a handgun and a shotgun.

From his vantage point along the west side of the laundromat, Ryan observed Klein exit the building through the south door. When Ryan saw that there was no movement or action by other officers, Ryan claims that he shouted to Klein by name, identified himself as a police officer, and told Klein to halt. Lombardo also claims that he heard someone, whom he believed to be Ryan, identify himself as a police officer and order Klein to halt.

As he left the building, Klein was positioned between Ryan (to the west) and Lombardo (to the east). Klein claims that he had walked south about twenty feet toward his car when he heard someone shout, "What were you doing in the laun-

dromat for a few minutes? We want to talk to you." Klein turned and saw a man in plain clothes pointing a gun at him.[1] Klein became scared and ran toward his car, dropping a plastic bucket containing the stolen coins. While he was running, Klein claims that he heard two shots,[2] but he was not hit. In his attempt to get away, Klein cut his wheels hard and backed up in a northerly direction, then made a hard left, heading his vehicle past Arby's, toward the east exit of the parking lot. As Klein was headed out of the parking lot, he heard some gunshots, mostly shotgun blasts, and felt some stings, but continued on to the street.

Lombardo asserts that after he heard someone shout for Klein to halt, he saw Klein running toward his car, which was approximately thirty to fifty feet from Lombardo's position. Lombardo moved out from behind the dumpster in the direction of Klein's car. As he approached Klein's car, he claims that it was "coming at me in reverse, attempting to run me down, and I was able to move out of the way to the south." Ryan also saw the car back up toward Lombardo, and Lombardo move out of the car's path.

After Lombardo evaded the car, Lombardo saw the car head east out of the parking lot. Lombardo then fired at least two rounds from his shotgun. Lombardo claims that he was aiming at Klein's rear right tire. Despite these shots, Klein continued out of the parking lot at a high rate of speed. Lombardo claims that he noticed that there were no police vehicles positioned to prevent Klein's escape from the east exit of the parking lot. Lombardo then fired another round at the rear of the vehicle.

As Klein was exiting the parking lot, Ryan also fired three shots with a handgun, allegedly aiming at Klein's right rear tire. None of Lombardo's or Ryan's shots had any effect on the tire, although the rear window was shot out. After Klein drove out of the parking lot, a number of

---

1. On the night of the burglary, Ryan and his partner, Mark Tobias, were driving an unmarked car and were not wearing uniforms.

2. Ryan denies having taken any shots before Klein was driving away in his automobile.

police vehicles began to pursue him. After driving about five or six blocks, Klein abandoned his car and fled on foot, eluding capture.

Although the Glen Ellyn police were unsure whether Klein had been injured during his escape, Tobias alerted area hospitals to be on the lookout for a man fitting Klein's description with a gunshot wound. On May 15, 1983, Ryan received a call from St. Anne's Hospital in Northlake, Illinois, informing him that a patient fitting Klein's description with a gunshot wound was at the hospital. Klein had checked into the hospital under the alias of Michael Telleen, claiming that he had been injured during a fight in a bar.

Klein subsequently pleaded guilty to the charge of burglary and was sentenced to four years imprisonment. After being released from the penitentiary, Klein developed seizures as a result of his head wound. Klein then filed an action under 42 U.S.C. § 1983, alleging that Ryan and Lombardo violated his fourth and fourteenth amendment rights when they shot him as he was fleeing from the scene of the burglary. The district court granted summary judgment for the defendants on the basis of qualified immunity. Klein appeals the district court's ruling. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## II. ANALYSIS

■ The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages. To overcome the defense of qualified immunity, the plaintiff must show that the officials violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

A court should grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.

R.Civ.P. 56(c); *Reardon v. Wroan,* 811 F.2d 1025, 1027 (7th Cir.1987). As we have explained, "appellate review of a denial of summary judgment on the issue of qualified immunity is limited to the legal question of whether the law was well established at the time of the conduct." *Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986); *see Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). "[I]f there are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial." *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987).

Klein has the burden of demonstrating that the defendants violated a constitutional right that was clearly established on May 12, 1983. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020–21, 82 L.Ed. 2d 139 (1984); *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987). For a right to be "clearly established,"

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citation omitted). As this circuit has held, "[t]he right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). In determining whether a right was clearly established, we often look to closely analogous case law. *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986).

■ The parties agree that the relevant law governing this case is the Illinois fleeing felon statute.[3] In 1983, the statute stated:

---

**3.** Two years after the Family Pride Laundromat

burglary, the Supreme Court held that police

(a) A peace officer ... is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that:

(1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(2) The person to be arrested has committed or attempted a forcible felony....

Ill.Rev.Stat. ch. 38, ¶ 7–5 (1981).

The parties agree that Ryan and Lombardo reasonably believed that Klein had committed the forcible felony of burglary at the time of the shooting, thus satisfying the second prong of the statute. Our sole inquiry, then, is whether a reasonable officer in the circumstances confronting the defendants would have believed that the use of deadly force[4] was necessary to prevent Klein from defeating the arrest by escape. In making this determination, we must consider all the undisputed facts in the record, viewing them in the light most favorable to Klein. *Green v. Carlson,* 826 F.2d at 650.

In *Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court authorized a fact-specific inquiry to determine whether an official's conduct violated clearly established law. In that case, several police officers conducted a warrantless search of the Creighton home. The Court recognized that law enforcement officers, on occasion, will reasonably but mistakenly conclude that probable cause is present. If an official's actions are objectively legally reasonable, the official should not be held personally liable. *Id.* 107 S.Ct. at 3039. In examining the issue of qualified immunity, the Court held that "[t]he relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant." *Id.* at 3040. This circuit has also recognized that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987).

Therefore, we must consider the specific facts confronting Ryan and Lombardo when they began shooting at Klein. Both Ryan and Lombardo knew that Klein had just committed a forcible felony. They also

---

officers may not use deadly force to prevent the escape of an apparently unarmed felony suspect unless such force is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a threat of death or serious injury to the officer or others. *Tennessee v. Garner,* 471 U.S. 1, 11–12, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). Following the decision in *Garner,* Illinois amended its fleeing felon statute to limit the use of deadly force to instances where the forcible felony "involves the infliction or threatened infliction of great bodily harm." Ill.Ann.Stat. ch. 38, ¶ 7–5(a)(2) (Smith–Hurd Supp.1987).

On May 12, 1983, however, the existing Illinois fleeing felon statute was not considered unconstitutional. Although no case had specifically adjudicated the constitutionality of the Illinois statute, Illinois state courts and federal courts had applied the statute. *See, e.g., Onesto v. Police Bd.,* 92 Ill.App.3d 183, 416 N.E.2d 13, 48 Ill. Dec. 118 (1st Dist.1980); *LaMonte v. City of Belleville,* 41 Ill.App.3d 697, 355 N.E.2d 70 (5th Dist.1976); *Silverman v. Ballantine,* 694 F.2d 1091 (7th Cir.1982); *Rodriguez v. Schweig-*

er, 534 F.Supp. 229 (N.D.Ill.1982). Because qualified immunity analysis requires us to apply the law that was clearly established on May 12, 1983, *see Zook v. Brown,* 748 F.2d 1161, 1164 (7th Cir.1984), *Garner* does not control this case. *See Brown v. City of Clewiston,* 644 F.Supp. 1417, 1420–22 (S.D.Fla.1986) (Florida statute in existence prior to *Garner* provided clearly established law in 1983 because no Florida court had ever held that statute unconstitutional); *Lundgren v. McDaniel,* 814 F.2d 600, 603 (11th Cir. 1987) (citing *Brown*).

4. Section 7–8 defines deadly force:

(a) Force which is likely to cause death or great bodily harm, within the meaning of Sections 7–5 and 7–6 includes:

(1) The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

(2) The firing of a firearm at a vehicle in which the person to be arrested is riding. Ill.Rev.Stat. ch. 38, ¶ 7–8 (1981).

knew that Klein had carried a gun in the past.

In addition, the defendants reasonably believed that Klein heard an officer identify himself as a policeman and tell Klein to halt. Ryan asserts that he identified himself as a police officer and told Klein to halt. Lombardo also heard someone shout: "Klein, halt, police!" Klein denies having heard anyone identify themselves as police officers. Nevertheless, Klein does not present any evidence to dispute that Ryan did identify himself as a police officer;[5] Klein merely says that he did not *hear* anyone do so. Thus, we find, as did the district court, that it is undisputed that Ryan identified himself as a police officer and ordered Klein to halt. The district court also found undisputed that it was late at night in a quiet suburban parking lot. Lombardo was thirty to fifty feet from Klein when he heard an officer order Klein to halt. Significantly, Klein was between Ryan and Lombardo when Lombardo heard the command to halt. Therefore, an officer in Lombardo's or Ryan's position reasonably could have assumed that Klein did hear the order to halt, but ignored it as he attempted to flee the scene.[6]

■ Viewing the undisputed evidence in the light most favorable to Klein, we will assume that Klein was unarmed and that Klein did not threaten the officers in any way. With these assumptions, we have reconstructed the following scenario. Police officers tell a person, who they reasonably suspect of having committed a forcible felony, to halt. They reasonably believe that the suspect heard them, but the suspect continues to flee. The suspect gets in his car and begins to drive away, with no resistance from any other officer. In this situation, a police officer could reasonably believe that deadly force was "necessary to prevent the arrest from being defeated by

resistance or escape." Ill.Rev.Stat. ch. 38, ¶ 7–5(a)(1) (1981). The decisions of Illinois courts in factually similar cases arising under this statute also support this conclusion. *See Onesto v. Police Bd.*, 92 Ill. App.3d 183, 416 N.E.2d 13, 48 Ill. Dec. 118 (1st Dist.1980) (police officer reasonably used deadly force to prevent escape of fleeing felony suspect who failed to stop after warning was given); *Moore v. Chicago Police Bd.*, 42 Ill.App.3d 343, 355 N.E.2d 745 (1st Dist.1976) (police officer acted reasonably in using force likely to cause death or great bodily harm against burglary suspect who resisted arrest); *LaMonte v. City of Belleville*, 41 Ill.App.3d 697, 355 N.E.2d 70 (5th Dist.1976) (police officer acted reasonably in shooting robbery suspect who, after being disarmed in struggle with police, tried to escape despite orders to halt).

Klein argues that the defendants improperly used deadly force in this instance because reasonable alternatives were available to them. *See Fornuto v. Police Bd.*, 38 Ill.App.3d 950, 957, 349 N.E.2d 521, 527 (1st Dist.1976) (suggesting officer should first exhaust all reasonable alternatives to prevent escape by non-violent means); *but cf. Moore*, 42 Ill.App.3d at 348, 355 N.E.2d at 749 (because Illinois law authorizes the use of deadly force when a suspect is arrested for the forcible felony of burglary, the amount of force the police officer actually used could not be considered excessive). Klein contends that because the police knew the suspect, they simply could have allowed Klein to escape the scene of the burglary and arrested him at a later time. Klein recognizes that Ryan had checked out an address that was supposedly Klein's and found it to be fictitious. Nevertheless, Klein insists that, with "a bit more investigative work," the police could have located Klein. Klein provides no sup-

---

5. Klein did not attempt to interview other officers at the scene to dispute Ryan's allegation that he shouted a warning to Klein to halt. *See Ford v. Childers*, 650 F.Supp. 110, 113 (C.D.Ill. 1986) (plaintiff's self-serving statement that he did not hear the policeman's warning was insufficient to meet plaintiff's burden before a jury where plaintiff failed to interview the other officer present during the incident).

6. According to Klein, he had no idea that Ryan, who was wearing civilian clothing, was a policeman. Klein saw a man pointing a gun at him, and his only thought was to get away. Nevertheless, even if we accept Klein's version as true, we must consider the facts known to the defendants at the time of the shooting.

port for this surprising assumption; nor does Klein suggest what investigative techniques the police should have employed to find him. Contrary to Klein's assertions, however, the Glen Ellyn Police Department had no idea how to locate Klein. Ryan had earlier checked the only address the department had for Klein and found it to be a false lead. In fact, after Klein eluded the police on the night of the burglary, the police were only able to apprehend him because he appeared at an area hospital complaining of gunshot wounds. In addition, when he checked into the hospital, Klein was using an alias, compounding the problem of identification. Thus, Klein provides no support for his theory that the police could have easily apprehended him following the burglary. While we must review the undisputed evidence in the light most favorable to Klein, we need not accept conclusory allegations completely lacking evidentiary support. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (party opposing summary judgment motion cannot rely on mere allegations, but must present affirmative evidence); *Valentine v. Joliet Township High School Dist. No. 204*, 802 F.2d 981, 986–87 (7th Cir.1986) (plaintiff's conclusory allegations, without supporting affidavits or other evidence, were not sufficient to establish a material issue of fact requiring a trial).[7]

■ Klein also relies on the fact that the chief of the Glen Ellyn Police Department believed that Ryan and Lombardo used excessive force and subsequently disciplined both of them. Lombardo and Ryan, however, were suspended for violating police department regulations. In this action, the plaintiff claims that the defendants violated state law; therefore, the local police department regulations are irrelevant in determining what was clearly established law. *Davis v. Scherer*, 468 U.S. 183, 194 & n. 12, 104 S.Ct. 3012, 3019 & n. 12, 82 L.Ed.2d 139 (1984) ("officials sued for violations of rights conferred by a statute or regulation ... do not forfeit their immunity by violating some other statute or regulation") (emphasis in original); *see Brown v. City of Clewiston*, 644 F.Supp. 1417, 1420–21 (S.D.Fla.1986).[8]

■ Finally, Klein insists that the defendants, particularly Lombardo, received inadequate training to allow them to assess when the use of deadly force was appropriate. Qualified immunity, however, involves an objective inquiry. The subjective beliefs of the defendants are not in issue. *Anderson v. Creighton*, 107 S.Ct. at 3040. We need only consider whether a reasonable officer in like circumstances would have acted as the defendants did. Klein's reliance on *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), is misplaced. In *Malley*, the Supreme Court stated that "the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341, 106 S.Ct. at 1096. Klein insists that we must consider the defendants' training to determine whether they were "plainly incompetent." Klein is mistaken. The *Malley* Court ex-

---

**7.** Klein proposes other alternatives that would have avoided the need for deadly force. Klein suggests that deadly force would have been unnecessary if Ryan had arrested him inside the laundromat. This is mere speculation by the plaintiff. We will not second-guess an experienced police officer's decision as to the safest location in which to arrest a suspect. Klein also tries to persuade us that, as a reasonable alternative to shooting at him, the defendants could have chased him as he left the parking lot. Klein ignores the fact that neither Ryan nor Lombardo were in their cars as he was speeding away. Further, a high-speed chase through the streets of Glen Ellyn seems just as likely to endanger innocent bystanders as shooting at the suspect. Finally, we note that other officers did chase Klein and were unsuccessful in appre-

hending him. Thus, we are not persuaded that reasonable officers in the defendants' position would have utilized these alternatives. *See Onesto*, 92 Ill.App.3d at 186, 416 N.E.2d at 16, 48 Ill.Dec. at 121 (suggested alternatives to deadly force were "mere speculations with no reasonable basis in the evidence").

**8.** Klein also points to Ryan's deposition in which Ryan stated that, in retrospect, he also believed that both he and Lombardo used poor judgment in shooting at Klein. In determining whether a defendant violated clearly established law, however, the defendant's subjective beliefs are irrelevant. *Anderson v. Creighton*, 107 S.Ct. at 3040.

plained: "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have [acted as the defendants did]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* If, as we have determined, a reasonably competent officer would have acted as Ryan and Lombardo did, they necessarily cannot be characterized as "plainly incompetent."

### III. CONCLUSION

██ We certainly do not condone the unnecessary use of deadly force by police officers in any situation. The Supreme Court recently instructed courts that "[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). We recognize that the Glen Ellyn Police Department disproved of Lombardo's and Ryan's use of deadly force in trying to apprehend a burglar who, although fleeing the scene, did not have a weapon and did not physically threaten the officers.[9] Nevertheless, we cannot rely on the 20/20 vision of hindsight; rather, we must consider the undisputed facts as they were known to the defendants at the time of the burglary and apply the state law as it existed at the time of the burglary. Under the clearly established law of Illinois on May 12, 1983, we find that reasonable police officers would have been justified in using deadly force to prevent the escape of a person they reasonably believed to have committed the forcible felony of burglary.

9. At one point, Lombardo believed that Klein was trying to run him down with his car. When Klein first saw Ryan pointing a gun at him, Klein jumped in his car and hurriedly put the car in reverse, turning sharply. Unknown to Klein, he backed up his car in Lombardo's direction. (Klein maintains that he never saw Lombardo.) Lombardo had been told earlier that day that Klein had once tried to run over

Therefore, the defendants are qualifiedly immune from suit. The district court is

AFFIRMED.

someone with his car. Therefore, an officer in Lombardo's position, with Lombardo's knowledge of Klein, might reasonably have believed that Klein was trying to hit him with the car. Nevertheless, Lombardo easily moved out of the path of the vehicle. Thus, this was not an incident in which deadly force was necessary to prevent death or great bodily harm to a peace officer or other person.