**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**CONNECTICUT INDEMNITY COMPANY, Larry Weicht, Elizabeth Grant, and Cynthia Jessep, Defendants.**

Civ. No. 1:93cv227.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 25, 1994.

Diana C. Bauer, Robert T. Keen, Jr., Miller Carson Boxberger and Murphy, Fort Wayne, IN, for plaintiff.

Leonard E. Eilbacher, Dane L. Tubergen, Hunt Suedhoff Borror and Eilbacher, Fort Wayne, IN, for Connecticut Indem. Co. and Connecticut Specialty Ins. Group, Inc.

Larry Weicht, pro se.

Larry J. Burke, Fort Wayne, IN, for Elizabeth Grant.

John C. Grimm, Grimm and Grimm, Auburn, IN, for Cynthia Jessep.

*ORDER*

WILLIAM C. LEE, District Judge.

This matter is before the court on cross motions for summary judgment filed by the parties in this case. Plaintiff Liberty Mutual Insurance Company ("Liberty Mutual") filed

its motion for summary judgment on May 4, 1994. On this same date defendant Connecticut Indemnity Company ("Connecticut Indemnity") also filed a motion for summary judgment. The parties finished briefing the motions on May 23, 1994 and oral arguments were heard on July 21, 1994.

### Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*

475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essen-

tially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## Background Facts

The underlying facts in this case are undisputed and have been stipulated to as between Liberty Mutual and Connecticut Indemnity.

Gra–Bell Truck Line, Inc. ("Gra–Bell") is an interstate motor carrier licensed by the Interstate Commerce Commission ("I.C.C.") to transport goods by motor carrier over authorized routes, with its principal place of business located in Holland, Michigan. On February 24, 1993, Larry Weicht ("Weicht"), a resident of Angola, Indiana, entered into a written Equipment Lease Agreement ("Lease") with Gra–Bell. Pursuant to the Lease, Weicht, as the owner, leased his semi-tractor to Gra–Bell. The Lease allowed Weicht to operate his semi-tractor as a carrier in interstate commerce under Gra–Bell's I.C.C. Authority.

The Lease provides that Gra–Bell shall furnish and pay the costs of public liability, property damage and cargo insurance on the semi-tractor while it is operated in the service of Gra–Bell. The Lease also provides that Weicht shall furnish and pay the costs of public liability and property damage insurance on the semi-tractor while the same is not operated in the service of Gra–Bell. Liberty Mutual issued a policy of insurance to Gra–Bell and Connecticut Indemnity issued a policy of insurance to Weicht.

Liberty Mutual has admitted that the policy of insurance it issued to Gra–Bell always provides coverage to Gra–Bell for an accident involving a leased vehicle [1]. Specifically, Section I of the Truckers Coverage Form in the Liberty Mutual policy provides that all "hired autos" are covered autos under the policy. Thus, the Liberty Mutual policy always provides coverage for vehicles Gra–Bell

leases from others. Section II of the Truckers Coverage Form expressly provides that Gra–Bell is always insured for any covered auto, such as the semi-tractor leased from Weicht, when such auto is involved in an accident. Additionally Section II of the Liberty Mutual policy also provides that anyone operating a leased vehicle which is being used exclusively in Gra–Bell's business as a trucker is an insured.

The "Certificate of Non–Trucking Automobile Liability Insurance" which is attached to the Connecticut Indemnity policy states that:

No coverage is afforded when the described vehicle(s) is (are):

\*     \*     \*     \*     \*     \*

2. Used to carry property in any business or in route for such purpose.

The Connecticut Indemnity policy also contains Endorsement No. CA 23 09 01 87 which provides that:

This insurance does not apply to:

a. A covered "auto" while used to carry property in any business.

b. A covered "auto" while used in the business of anyone to whom the "auto" is rented.

On the evening of Saturday, April 24, 1993, Weicht was dispatched by Gra–Bell to proceed to Kellogg Company, located at Battle Creek, Michigan, to pick up a trailer loaded with breakfast cereal. The trailer was scheduled for delivery to Scot Lad Foods in Lima, Ohio by Monday, April 26, 1993 at 5:00 p.m. Weicht proceeded to the Kellogg Company location at Battle Creek, Michigan and picked up the loaded trailer and left just after midnight on April 25, 1993. After leaving Battle Creek, Michigan, Weicht drove to a truck stop located in Jamestown, Indiana, where he uncoupled the loaded trailer from his semi-tractor and left it at the truck stop. Weicht had permission from the truck stop to leave loaded trailers on its premises for short periods of time. After uncoupling the loaded trailer, Weicht logged himself off duty and

---

1. In fact, federal law places the responsibility for control and operation of leased vehicles squarely with the lessee carrier under whose I.C.C. permit the leased vehicles are operating. 49 U.S.C. § 11107(a)(4). Federal law also requires inter-

state motor carriers using leased vehicles to obtain public liability insurance that provides coverage for the use of the leased vehicle throughout the entire term of the lease. 49 U.S.C. § 10927(a)(1).

drove his semi-tractor from the truck stop in Jamestown to his home in Angola, Indiana.

On Sunday, April 25, 1993, Weicht performed scheduled routine maintenance on his semi-tractor, including lubrication and oil change and checking fluid levels and filters. It was Weicht's responsibility under the terms of the Lease to service and repair the semi-tractor as needed at his own cost.

Gra–Bell's dispatch office operates 24 hours per day from 7:00 a.m. on Monday until 12:00 noon on Saturday. All relevant dispatch decisions are made before noon on Saturday. It was customary for Gra–Bell to dispatch its drivers and owner-operators under Equipment Lease Agreements to pick up loaded trailers at the end of a week, usually Friday, for delivery on the following Monday for several reasons, including the usual loading and receiving hours within the industry as well as for the convenience of owner-operators, like Weicht.

After picking up loaded trailers dispatched to them at the end of a week, Weicht, and many other owner-operators under similar Equipment Lease Agreements with Gra–Bell, customarily uncoupled the loaded trailers from their semi-tractors and left them at various locations so that the owner-operators could spend the weekends at home. It was also customary for Weicht and other owner-operators of Gra–Bell to return with their semi-tractors to pick up the loaded trailers and deliver them to the assigned destination the following Monday. This practice was known by Gra–Bell to occur and Gra–Bell did not object to such practice prior to the accident of April 26, 1993.

Gra–Bell's company drivers, as well as owner-operators like Weicht, have several options available to them with respect to the locations at which the drivers may leave loaded trailers over the weekends. Gra–Bell has a terminal located in Charlotte, Michigan, approximately one hour from Weicht's home in Angola, Indiana. Company drivers and owner-operators are permitted to leave loaded trailers at the Charlotte, Michigan terminal overnight or over a weekend. Also, both company drivers and owner-operators have the option of leaving loaded trailers attached to their semi-tractors at their place of resi-dence. In addition, Gra–Bell permitted all of its drivers to uncouple loaded trailers and leave them at conveniently located truck-stops and then drive the tractor to their place of residence for a weekend stay.

On April 26, 1993, at approximately 1:30 p.m., Weicht was operating his semi-tractor from his home in Angola, Indiana on State Road 127 North in Angola in route to the truck stop in Jamestown to pick up the loaded trailer so that he could made his scheduled delivery to Lima, Ohio. As Weicht proceeded on State Road 127, his semi-tractor was involved in a motor vehicle accident with a vehicle operated by defendant Elizabeth Grant ("Grant"). Defendant Cynthia Jessep ("Jessep") was a passenger in the automobile operated by Grant. As a result of the collision, Grant and Jessep sustained personal injuries and the motor vehicle operated by Grant was damaged.

Weicht's truck log indicates that he was off duty when the accident occurred. Weicht never logged in on duty on the date of the accident. Weicht was not compensated by Gra–Bell in any way on the day of the accident. Gra–Bell compensated Weicht by the load and he was not paid by the hour or by the mile. Weicht had absolutely no contact with Gra–Bell on April 26, 1993, prior to the accident and, moreover, Gra–Bell exercised no control over the route followed by Weicht in making his deliveries.

Grant and Jessep have made claims against Gra–Bell and Liberty Mutual for their personal injuries and property damage sustained in the accident of April 26, 1993. Liberty Mutual has taken the position that Connecticut Indemnity should provide primary coverage for the accident. However, Connecticut Indemnity has denied that it is obligated to provide any coverage for the accident and, consequently, Liberty Mutual has filed the present suit for declaratory judgment against Connecticut Indemnity.

It is the position of Weicht and Gra–Bell that, on the day of the accident, when Weicht was travelling from his residence to the truck stop in Jamestown, Indiana, he was not acting in the service or trucking business of Gra–Bell. It is the position of Gra–Bell that,

from the time Weicht uncoupled the trailer from his semi-tractor at the truck stop until the time of the accident, he was not operating his semi-tractor under the direct dispatch of Gra–Bell.

Although Liberty Mutual has admitted that its policy provides coverage for the accident, Liberty Mutual seeks a declaration by this court that its policy is only excess and that the Connecticut Indemnity policy is primary[2]. However, as Connecticut Indemnity has noted, the issue of whether an insurance policy is primary or excess arises only when there is more than one policy that applies. Connecticut Indemnity thus seeks a declaration by this court that its policy does not apply to the accident in question.

### Discussion

■ In support of its motion for summary judgment, Connecticut Indemnity principally relies on three cases. Citing first to *McCaslin v. Insurance Company of the State of Pennsylvania*, 605 N.E.2d 760 (Ind.1993), Connecticut Indemnity argues that Indiana law holds that its policy does not provide coverage in this case.

The undisputed facts in *McCaslin* were as follows. On Friday, September 9, 1988, truck driver Phillip Cambe was operating his tractor-trailer rig under a lease agreement with Underwood Machinery Transport, Inc. Cambe picked up a machine in Illinois for delivery in Greenwood, Indiana. After delivering the machine, Cambe obtained a release number terminating his lease trip and began to drive his empty tractor-trailer rig to his home in Valparaiso, Indiana for the weekend. He was not required to contact the Underwood dispatcher for a new assignment until the following Monday morning. On the trip home, Cambe's truck collided with a pick-up truck driven by Robert McCaslin. McCaslin suffered severe permanent injuries as a result of the accident.

The McCaslins chose to proceed against Underwood and tried their case on the theory that notwithstanding the fact that Cambe had delivered the load for Underwood and was on his way to his home when the accident occurred, Cambe was within the course and scope of employment of Underwood and under the ruling case law, was responsible to the injured parties. After collecting the $2,000,000 policy limits under Underwood's policy, the McCaslins filed a motion for proceedings supplemental seeking to attach and execute against Cambe's personal trucking liability insurance policy issued by Pennsylvania, which had a policy limit of $500,000. After examining the Pennsylvania policy, the Indiana Supreme Court affirmed the trial court's dismissal of the McCaslin's motion for proceedings supplemental. The Court stated that:

In the case at bar, Pennsylvania's policy excluded coverage while Cambe was in the course and scope of his employment. When one examines the policy in its entirety, it becomes clear that it was the understanding and intent of the parties that as long as Underwood's insurer was liable, Pennsylvania would not be liable and that Pennsylvania's policy was strictly for the coverage of Cambe when he had left the coverage of Underwood's policy.

\* \* \* \* \* \*

It does not appear to ever have been the intention of Pennsylvania to issue a policy to cover Cambe in the entire operation of his truck including the period of time it would be under Underwood's liability. It is obvious it was a policy to cover Cambe when he was not covered under his lease agreement, and the premiums were adjusted accordingly.

\* \* \* \* \* \*

[B]y the McCaslins' choice, the law of the case has become that Underwood in fact was liable and collection was made accord-

---

**2.** The parties have agreed that the law allows parties to leases regulated by federal law to contract so that the lessor may agree to indemnify the lessee for losses caused by the lessor's negligence or for the lessor to carry insurance in addition to the insurance that the lessee is required to carry.

Weicht did, in fact, purchase insurance in addition to the insurance which federal law required Gra–Bell to carry. Thus, the question presently before this court is whether Weicht's Connecticut Indemnity policy provides coverage for the accident.

ingly. The Pennsylvania policy excluded coverage while Cambe was "in the business of" a third party. Having garnered the judgment against Underwood on the theory of *respondeat superior,* the McCaslins cannot now change this theory in order to collect such judgment against Pennsylvania.

605 N.E.2d at 761.

This court does not find *McCaslin* to be as conclusive as Connecticut Indemnity argues. Although the case does shed light on the Indiana Supreme Court's interpretation of the policy language at issue therein, this interpretation is of limited value for several reasons. First, the *McCaslin* court did not fully quote the policy language that it was interpreting. Therefore, this court cannot determine whether the language at issue in *McCaslin* was identical to the language in the Connecticut Indemnity policy. Second, the *McCaslin* court was not called upon to decide whether Cambe was in fact, "in the business of" Underwood. This issue had been previously decided (or stipulated to) and was therefore the law of the case.

Connecticut Indemnity has also cited to *Hartford Insurance Company of the Southeast v. Occidental Fire and Casualty Company of North Carolina,* 908 F.2d 235 (7th Cir.1990). In *Hartford* the following facts were stipulated. On September 10, 1985, John Dunn, driving a truck tractor owned by rich Transport of Dade City, Florida, rearended a car in Fort Wayne, Indiana. At the time, Dunn and his vehicle were leased to Lykes Transport, an interstate carrier operating under the authority of the I.C.C. Several days earlier, Lykes had dispatched Dunn to Fort Wayne to deliver a load of frozen orange juice concentrate. Dunn had not completed that delivery at the time of the accident.

Before Dunn left Dade City, Larry Rich, owner of Rich Transport, instructed him to have a faulty freon valve on the trailer repaired after delivering his load in Fort Wayne. The trailer leaked freon, and Dunn had to replenish the trailer's freon supply during the trip. When Dunn attempted to deliver the juice in Fort Wayne the buyer refused to accept it because it was too warm.

Dunn informed Lykes of the buyer's rejection and Lykes instructed him to take the juice to a cold-storage facility nearby. After placing the juice in storage, Dunn again telephoned Lykes and was again told to wait for further instructions.

Dunn then took his trailer to a repair facility in Fort Wayne, to have the freon valve repaired. He left the trailer there and drove his tractor to a truck stop, where he remained until the following afternoon when the repair shop notified him that the repairs had been completed. While driving to the repair shop to pick up his trailer, Dunn collided with a car that had stopped in front of him for a school bus. After the police completed their report at the scene of the accident, Dunn proceeded to pick up the trailer and then returned to the truck stop. Dunn called Lykes and was told to retrieve the juice the next morning and to deliver it to the buyer. The following morning, however, the buyer again refused to accept delivery of the juice. At Lykes direction, Dunn returned to Florida with the juice.

The sole issue in *Hartford* was whether, at the time of the accident, Dunn was operating for Lykes Transport or Rich Transport. Rich Transport was covered by a policy issued by Occidental Fire and Casualty Company of North Carolina. Like the Connecticut Indemnity policy in the present case, the Occidental Fire policy excluded coverage while the covered vehicle was "being used in the business of any person or organization to whom the automobile is rented." The Seventh Circuit Court of Appeals held that:

The fact that Lykes was leasing the truck is evidence that it was being used in Lykes's business, but it is not dispositive. To hold otherwise would render Rich's coverage a virtual nullity. The clear language of paragraph (C) of the Truckmen's endorsement controverts Occidental's interpretation by protecting Occidental from liability only when (1) the vehicle is rented *and* (2) it is being used in the lessee's business. The contract clearly contemplates occasions on which the vehicle, though rented, would not be engaged "in the business" of another. at such times, Occidental's policy applies. As Hartford

notes, Occidental could not avoid liability under its insurance contract had the accident occurred while Dunn was enjoying a "night on the town" in his rig simply because, at the time, it was rented to another company.

\*     \*     \*     \*     \*     \*

Despite rejecting Occidental's argument, we agree with the district court's conclusion that Occidental's policy excludes coverage because Dunn was, as a matter of [Wisconsin] law, using his truck "in the business of" Lykes at the time of the accident. We note initially, that the language of the Truckmens endorsement is unambiguous.... The phrase "in the business of an ... organization to whom the automobile is rented" clearly refers to occasions when the truck is being used to further the commercial interests of the lessee. That was the case here. Dunn had not completed his delivery for Lykes, remained in Fort Wayne at Lykes' command, and was en route to pick up his trailer in order to complete his delivery of the orange juice when the collision occurred. The possibility that Rich's interests coincided with those of Lykes does not diminish the benefits Lykes received from Dunn's actions; Dunn was furthering Lykes' commercial interests at the time of the collision, and Occidental's policy exclusion therefore applies.

Even if we found paragraph (C) of the endorsement ambiguous, the context of the entire exclusion resolves any doubts about its meaning and applicability in this case. The Truckmen endorsement is also called, in the policy, "insurance for non-trucking use." That appellation suggests the scope of the policy coverage: it applies only when the truck is being used for purposed unrelated to trucking. Moreover, the endorsement leaves no doubt that trucking-related business is not confined to periods when the tractor is hauling goods. Paragraph (B) excludes coverage whenever the truck carries property in any business. By implication, then, a truck tractor may be "in the business of" lessees under paragraph (C) of the exclusion even when it is not hauling goods; that is when it is bobtailing.

908 F.2d at 238–39.

The *Hartford* case is instructive in several respects. First, the case offers a common sense approach to the resolution of the phrase "in the business of" by defining the term to mean "occasions when the truck is being used to further the commercial interests of the lessee." Second, the case gives an insightful explanation of the meaning and applicability of the exclusionary endorsement as a whole: coverage is only provided when the truck is being used for purposes unrelated to trucking and "trucking-related" business may include periods when the tractor is not hauling goods.

Lastly, Connecticut Indemnity relies on *Occidental Fire & Casualty Company of North Carolina v. Padgett,* 113 Ill.App.3d 215, 68 Ill.Dec. 766, 446 N.E.2d 937 (1983). The pertinent facts of *Occidental* are as follows. On March 4, 1977, Padgett, a trucker/owner, entered into a "permanent lease" with Ace Doran. (Contrasted in the industry with a "trip lease", a "permanent lease" continues at least on a monthly basis until it is terminated.) Before the day of the accident from which the coverage question arose, Padgett had picked up a load to Ohio pursuant to his "permanent lease" and was notified by an Ace Doran terminal manager that the company had a load available for him in Galesburg. Padgett proceeded to Indiana, where he picked up a load for National Trailer Convey under a "trip lease", and continued on to Galesburg.

After arriving at the Ace Doran terminal in Galesburg, Padgett waited from morning until closing for his trailer to be loaded. The terminal manager finally told him it would not be possible to load the trailer that day, and that he should go home. Padgett left his trailer at the terminal to be loaded and proceeded home (to Indiana) on Interstate 74. Ace Doran's name and I.C.C. permit number were on his tractor and were not concealed. While traveling through Peoria County, he struck a vehicle, giving rise to the underlying tort action.

Padgett was insured by Occidental Insurance Company. Occidental's policy provided

that coverage was excluded "while the automobile is being used in the business of any person or organization to whom the automobile is rented."

The sole issue before the court was whether Padgett was "in the business" of Ace Doran. The court noted that Padgett was returning home pursuant to Ace Doran's instructions and with the expectation of returning to the Ace Doran terminal to pick up the load. The court also stated:

> While not controlling, we are also mindful of the ICC regulatory scheme. As indicated in *Schedler* [*v. Rowley Interstate Transportation Co.*, 68 Ill.2d 7, 11 Ill.Dec. 541, 368 N.E.2d 1287] [an Illinois Supreme Court case decided in 1977], an authorized carrier must remove any legend or removable device showing it as the operating carrier before relinquishing possession of equipment.

\* \* \* \* \* \*

At the time of the accident at bar, Ace Doran's name and permit number were on Padgett's tractor.

It is clear that under the ICC regulatory scheme Padgett was "in the business" of Ace Doran; indeed, the carrier has never contested its potential liability. The facts of this case further present a situation where a lessor was directed to return home by a lessor-carrier and intended to return after a holiday without carrying any other loads in the interim. While there may be cases where a certified carrier's liability and an "in the business" characterization may not be coextensive, the facts at bar indicate such a relationship herein. We therefore hold that Padgett was "in the business" of Ace Doran at the time of the accident, and that the incident thus falls within plaintiff's policy exclusion.

446 N.E.2d at 940–41.

Unfortunately, the *Occidental* decision is not very persuasive for several reasons. The decision was rendered by an Illinois appellate court which relied, at least in part, on Illinois case law. Furthermore, the facts of the case are unlike the facts of the case presently before this court as Padgett was instructed to go home and wait for another load. In the present case, Weicht was not instructed to go home, he did so on his own volition.

Liberty Mutual also principally relies on three cases. Liberty Mutual first cites to *Empire Fire and Marine Insurance Company v. Midwestern Indemnity Company*, 402 N.E.2d 998 (Ind.App.1980). In *Empire Fire*, trucker Ray Piper was insured by Empire Fire for the "non-business use" of a semitractor which was involved in an accident. Midwestern Indemnity was the liability carrier for Specialized Carriers, which had leased Piper and his vehicle for a haul of coil steel from Gary, Indiana to Anderson, Indiana. After delivering the steel, Piper stopped at a bar and consumed two beers. While returning back to Gary, he ran a stop sign and was involved in an accident.

The lease between Specialized and Piper was a trip-lease, and provided that the lease would terminate upon delivery of the steel in Anderson, Indiana. The sole issue before the court was whether Piper was acting in Specialized's business while returning from the trip lease to Anderson.

In its decision, the *Empire Fire* court quoted a 1977 Indiana appellate case which held that a lessor is not "on a lessee's business" unless the lessee would also be liable under the doctrine of *respondeat superior*. The court then noted that, under Indiana law, an employee is not acting in the scope of his employment while he is traveling to or from his employment. The court then held that Piper was engaged in conduct that would not have resulted in Specialized being held responsible under the doctrine of *respondeat superior* and, therefore, Specialized's insurance policy was not applicable.

The *Empire Fire* decision is an important precedent in some respects because it applied the doctrine of *respondeat superior* as it is recognized in Indiana. However, the decision is far from controlling due to the vast difference in the facts. In *Empire Fire*, the driver had a trip lease and had already delivered his load at the time of the accident. The lessee had no control, or interest in having control, over the driver once the load was delivered. In the case presently before this court, Weicht and Gra–Bell were parties to a permanent lease which gave Gra–Bell

exclusive control and responsibility over the tractor during the entire time period of the Lease. Although the parties have stipulated that Gra–Bell did not have control over which routes Weicht chose to travel on, it is clear that Gra–Bell reserved the right to exercise such control. See ¶ 18 of the Lease.

Moreover, the doctrine of *respondeat superior* is often difficult to apply to the trucking industry and is especially difficult to apply to the facts in the case at bar. Unlike the usual situation with an office worker or a factory worker, it is difficult to determine when a truck driver is travelling to and from work and when he is actually working. Although carriers such as Gra–Bell have terminals from which they dispatch a driver, the driver's "place" of employment is in his truck and on the road. As Weicht was paid by the load, rather than by the hour or by the mile, a logical conclusion is that any act Weicht takes in furtherance of his job of delivering a load is "within the scope of his employment" as that phrase is used in the doctrine of *respondeat superior*. This conclusion is bolstered by the Seventh Circuit's decision in *Hartford, supra*, in which the Court found that a driver was "in the business of" a carrier any time the driver was furthering the carrier's commercial interests.

Liberty Mutual has also cited to *Acceptance Insurance Company v. Canter*, 927 F.2d 1026 (8th Cir.1991). In *Acceptance*, Clarence Caldwell, a trucker/owner, leased his tractor to the Britton Motor Service. The Home Insurance Company insured Britton and the Acceptance Insurance Company insured Caldwell. The Acceptance policy did not provide coverage "while the automobile is being used in the business of any person or organization to whom the automobile is rented."

Caldwell had returned to Britton's St. Paul terminal during either the evening of November 2, 1988 or the morning of November 3, 1988. Caldwell then waited at the terminal for a load to deliver. Freight did not arrive and, thus, at about noon on Friday, November 4, Caldwell decided to drive to his home in Wisconsin. Britton instructed Caldwell to call the terminal the following Monday morning to see if any freight was available. Cald-

well was involved in an accident on his way home. Caldwell was pulling an empty trailer at the time of the accident, apparently to provide stability to the tractor.

Applying Minnesota law, the court found that Caldwell was not "in the business of" Britton when the accident occurred. The court emphasized the fact that Caldwell was off-duty at the time of the accident and was free to spend the weekend as he wished.

The court finds *Acceptance Insurance* to be unpersuasive for several reasons. First, the court relied on Minnesota law, rather than Indiana law. Second, the driver was on his way home, without any instructions to deliver a load by a certain time, at the time of the accident. Thus, at the time of the accident the driver was not furthering the commercial interests of the carrier in any way.

Finally, Liberty Mutual has cited *McLean Trucking Company v. Occidental Fire & Casualty Company of North Carolina*, 72 N.C.App. 285, 324 S.E.2d 633 (1985). In *McLean*, a driver, Wright, leased his truck for one year to McLean Trucking Company. Occidental insured Wright and his tractor. The Occidental policy did not provide coverage "while the automobile is being used in the business of any person or organization to whom the automobile is rented."

Wright was dispatched from his home to plaintiff's terminal in Wilson, North Carolina, to deliver freight in New Jersey. From New Jersey, he was dispatched to Miami and Jacksonville, Florida. After unloading in Jacksonville, Wright called McLean's central dispatcher in Winston–Salem. Freight was not available, thus Wright proceeded to Laurinburg, North Carolina pulling an empty trailer. He arrived in Laurinburg on Thursday, January 29, 1981 but did not get an assignment. He was told that he might receive an assignment from Wilson on Monday. Wright, on his own election, proceeded to his home in Broadnax, Virginia. On his way home, Wright collided with a Greyhound bus.

The sole issue before the court was whether Wright was "in the business of" McLean at the time of the accident. The court noted that:

While plaintiff may be held strictly liable to third parties, the I.C.C. regulations do not prevent plaintiff from allocating its risk through insurance or indemnification agreements with a lessor.

\* \* \* \* \* \*

Because defendant insurer did not specifically or by reference incorporate the applicable I.C.C. regulations into its policy to define the phrase "in the business of" to the same extent as strict liability may be applied, we must apply time honored principles of insurance contract construction consistently with the context in which the phrase is used and its meaning accorded it in its ordinary use.

\* \* \* \* \* \*

[W]e find that the phrase "in the business of" is best defined in the common law doctrine of respondeat superior. It is axiomatic that in order to predicate liability under this doctrine the employee would have to be within the scope of employment, furthering the business of the employer at the time of the accident, therefore, "in the business of" the lessee. [citation omitted] The law in this state is equally clear that an employee is not engaged in the business of the employer while driving home from his place of employment.

324 S.E.2d at 636–37.

Again, this case is very unpersuasive for the same reasons *Acceptance* was unpersuasive. The court did not apply Indiana law and the driver was travelling home, rather than to pick up a load, when the accident occurred.

After carefully studying the facts of this case, both insurance policies, the Lease, and all the pertinent case law, this court concludes that the Connecticut Indemnity policy, by virtue of its Truckers Endorsement, does not provide coverage for the accident. Considering the language of the Truckers Endorsement, which is specifically titled "Truckers—Insurance for *Non–Trucking Use*" (emphasis added), it is abundantly clear that the Connecticut Indemnity policy does not provide coverage in the case at bar. Weicht was obviously engaging the tractor in a "trucking use" at the time of the accident as he was completing his direct dispatch orders by returning to pick up an assigned load he had left at the truckstop over the weekend, as Gra–Bell permitted him to do.

This conclusion is reinforced by the language of the "Certificate of Non–Trucking Automobile Liability Insurance" which is attached as part of the Connecticut Indemnity policy. This Certificate was issued to Gra–Bell and certifies that coverage in the name of Larry Weicht is provided by Connecticut Indemnity. This Certificate expressly provides on its face that the Connecticut Indemnity policy does not provide coverage when Weicht's tractor is "Used to carry property in any business or in route for such purpose." Thus, Gra–Bell was specifically put on notice that the Connecticut Indemnity policy would not provide coverage if the tractor was involved in an accident while being driven to any destination to pick up a load of goods.

As noted earlier, this interpretation of the Connecticut Indemnity policy is in line with the Seventh Circuit's interpretation of nearly identical policy language in *Hartford, supra.* In *Hartford* the Seventh Circuit held that a driver was "in the business of" a carrier any time the driver was furthering the carrier's commercial interests. Clearly, at the time of the accident, Weicht was furthering the commercial interests of Gra–Bell as he was in route to pick up a load of cereal to deliver to Lima, Ohio on behalf of Gra–Bell. Additionally, even though the parties have stipulated that Weicht was not under Gra–Bell's "direct dispatch" at the time of the accident, it is clear that Weicht was under general dispatch throughout the entire weekend. Weicht was not free to do entirely as he pleased during the weekend as he had a deadline to meet Monday. Thus, he had to ensure that his tractor was in working order and that he had enough sleep and off-road time to satisfy the federal regulations. (See Stipulation No. 32.)

It is also important to note that, contrary to Liberty Mutual's assertions, the Liberty Mutual policy covered both Weicht and the tractor at the time of the accident. Section II of the Liberty Mutual policy describes who the policy insures. Part 1.b. states that anyone (with five exceptions that do not apply to this case) who uses the leased tractor

with Gra–Bell's permission is covered by Liberty Mutual's policy. It is not disputed that Weicht had Gra–Bell's permission to drive the tractor home for the weekend. Consequently, it is obvious that the Connecticut Indemnity policy was to be in effect only when Weicht was using the tractor for some unauthorized purpose, such as a night out on the town.

Therefore, it is the ruling of this court that the Connecticut Indemnity policy does not provide coverage for the accident in this case.

### Conclusion

For all the foregoing reasons, Connecticut Indemnity's motion for summary judgment is hereby GRANTED and Liberty Mutual's motion for summary judgment is hereby DENIED.

Connecticut Indemnity's motion to strike Liberty Mutual's reply brief is MOOT by virtue of this court's order of July 7, 1994.