57 F.3d 1080
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Barbara DIETRICH, as the surviving spouse of Dale Dietrich,
Deceased, Plaintiff,
v.
ALBERTSONS INC., a Delaware Corporation, Defendant,
and
Margarito GARCIA, Personal Representative of the Estate of
Lucas Garcia, Deceased; Sheila Garcia, as the alleged
surviving spouse of James Garcia, Deceased; Margarito
Garcia, Personal Representative of the Estate of James
Garcia, Deceased, Defendants-Appellees,
and
MAYFLOWER TRANSIT, INC., an Indiana Corporation, Defendant,
Crossclaimant, Third Party Plaintiff-Appellee,
v.
COAST TO COAST MOVING AND STORAGE COMPANY, a Missouri
Corporation, Defendant, Cross Claim Defendant-Appellant,
and
TRUCK INSURANCE EXCHANGE, Third Party Defendant-Appellant.
 No. 94-2103.
(D.C. No. CIV-90-992-JB)
 United States Court of Appeals, Tenth Circuit.
 June 14, 1995.
 
 1
 Before ANDERSON, MCWILLIAMS, and ALARCON,[2] Circuit Judges.
 
 
 2
 This diversity action arose out of an accident involving a truck owned by Coast to Coast Moving and Storage Co. ("Coast"), a Missouri corporation, and leased to Mayflower, Inc., an Indiana corporation, engaged in the interstate transport of household goods and operating under a certificate issued by the Interstate Commerce Commission ("ICC"). Due to the negligence of the Coast driver, Lucas Garcia, the Coast/Mayflower truck crashed head on into a truck owned and operated by Albertsons, Inc., killing the occupants of both vehicles. Mayflower and Truck Insurance Exchange ("TIE"), Coast's liability insurer, paid the wrongful death claim of Dale Dietrich's estate as well as the worker's compensation and property damage claims of Albertsons.[3] Both Mayflower and TIE reserved the right to proceed against the other for indemnification. Following a jury trial, the district court entered judgment in favor of Mayflower.[4]
 
 
 3
 Two issues are presented in this appeal: (1) whether Coast agreed to indemnify Mayflower for the loss; and (2) whether, notwithstanding any other indemnification agreement, Mayflower undertook to insure Coast against this loss. We uphold the jury's verdict and hold that (1) Coast did agree to indemnify Mayflower and (2) that Mayflower did not insure Coast against the loss. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. 1291, we affirm the district court's judgment in favor of Mayflower.
 
 BACKGROUND
 
 4
 On September 8, 1990, Lucas Garcia and his brother, James Garcia, were traveling southbound on highway 285, approximately twenty miles north of Roswell, New Mexico. Mr. Garcia had picked up a load for Mayflower in Boise, Idaho, on Thursday, September 6, and he was to deliver the load to Cannon Air Force Base in Clovis, New Mexico, on Monday, September 10.
 
 
 5
 Mr. Garcia crossed the center line of the two lane highway and collided head on with the northbound Albertsons truck, killing the occupants of both vehicles. At the time of the collision, Mr. Garcia had a blood alcohol concentration of .243 percent, three times the legal limit in New Mexico, see N.M. Stat. Ann. 66-8-102(C) (Michie Supp.1994); his brother had a blood alcohol concentration of .275 percent.
 
 
 6
 At the time of the accident, Mr. Garcia was not en route to his destination point in Clovis, but was instead on his way to his parents' home in Hobbs, New Mexico. Testimony at trial established that Mr. Garcia's deviation from his route was either "deadheading" or "bobtailing." Appellant's App., Vol. II at 59, 188.[5]
 
 
 7
 The relationship between Mayflower and Coast began in 1984 when the companies entered into two contracts. The first of these was an agency agreement. Coast agreed to act as Mayflower's agent, handling storage, the booking of moves, and sales in the Kansas City, Missouri, area. By the second agreement, entitled "Agent's Equipment Agreement," Coast agreed to supply equipment and drivers to service Mayflower's transportation needs.
 
 
 8
 Both the equipment lease and the agency agreement contained hold-harmless terms which provided that Coast would "protect and fully indemnify and hold harmless [Mayflower] against any wrongful or unauthorized act that is beyond the scope of this agreement." Appellant's App., Vol. I at 368 (Agent's Equipment Agreement).[6]
 
 
 9
 Federal regulations governing the lease of vehicles by an interstate carrier require lessees such as Mayflower to assume "complete responsibility for the operation of the equipment." 49 C.F.R. 1057.12(c)(1). Because Mayflower is an "authorized carrier of household goods," however, the regulations permit the parties to "provide in the lease that the provisions required by paragraph (c)(1) of this section apply only during the time the equipment is operated by or for the authorized carrier lessee." Id. 1057.12(c)(3).[7]
 
 
 10
 In response to these federal requirements, Mayflower established a "PL/PD" (Public Liability/Public Damage) program whereby it required all agents to contribute to a pool out of which the first one million dollars in costs and damages arising from a claim against Mayflower by a member of the public for negligent acts committed by drivers would be paid. Appellee's Br. at 1. Prior to August 1, 1990, each agent contributed a flat two percent of its "line haul" for the PL/PD coverage. Appellant's App., Vol. I at 377; id., Vol. II at 233, 279. Effective August 1, 1990, however, the individual agents began contributing according to their "loss ratio" so that those agents with a lower accident rate contributed less while those with more claims contributed more to the PL/PD fund. Susan Schmidt, President of Coast, acknowledged that she was aware of the new rates as of August 1, 1990, a month prior to the accident giving rise to this litigation, Appellant's App., Vol. II at 279-80, and that she had begun paying a lower rate for coverage as of that date. Id.
 
 
 11
 In addition to the change in the way the agent's contributions to the PL/PD pool were calculated, Mayflower also dramatically altered the coverage provided. Under the prior policy (the "first policy"), bobtail and bobtail deadhead coverage was included. Appellant's App., Vol. I at 376. However, under the later policy (the "second policy"), bobtail and bobtail deadheading were specifically excluded from coverage, meaning that the agent/lessor was required to obtain liability coverage to cover times when the driver was bobtailing or deadheading. Id. at 379.
 
 
 12
 Throughout this litigation Mayflower's position has been that Lucas Garcia's actions were "wrongful," "unauthorized," and "beyond the scope" of the equipment lease agreement. Thus, by the clear terms of the hold-harmless provision, Mayflower argues, Coast is obligated to indemnify Mayflower for its costs in settling the Dietrich and Albertsons claims. Coast, on the other hand, maintains that the hold-harmless provision is either void as a matter of law or patently ambiguous. In the case of the latter, Coast argues, the court should have construed the ambiguity against the drafting party, Mayflower, and entered judgment as a matter of law in favor of Coast.
 
 
 13
 Coast also asserts that Mayflower is an insurer because the agents' contributions to the PL/PD pool were, effectively, premiums paid, and the accident was within the scope of coverage provided by Mayflower, as reflected in the first policy update.[8]
 
 
 14
 Relying on federal regulations which draw a distinction between household goods carriers and other interstate transporters, see 49 C.F.R. 1057.12(c)(3), Mayflower responds that under either the first policy or the second policy there was no coverage because Mr. Garcia was not operating "by or for the carrier," Mayflower, at the time of the accident. Alternatively, Mayflower argues, if there was a policy in effect at the time, it was the second policy rather than the first policy. Thus, Mayflower argues, because Mr. Garcia was deadheading, then by the explicit provision excluding deadhead and bobtail coverage, the accident was not covered under the PL/PD policy.
 
 
 15
 Both parties moved for summary judgment. In denying the motions, the district court found the hold-harmless provision ambiguous, but concluded that "it's for the fact finder to determine exactly what the parties had in mind and exactly what the conduct of Mr. Garcia has to play in this role." Appellant's App., Vol. I at 401-02. The matter was tried to a jury beginning on July 12, 1993. The court denied Coast's motion for a directed verdict and the jury returned its answers to the following special interrogatories:
 
 
 16
 1. In accordance with the Court's instructions, under the contractual agreements between Mayflower and Coast to Coast, did Coast to Coast agree to hold harmless and indemnify Mayflower for the accident which occurred in this case? Answer: Yes
 
 
 17
 2. In accordance with the Court's instructions, under the contractual agreements between Mayflower and Coast to Coast, did Mayflower agree to insure Coast to Coast for the accident which occurred in this case? Answer: No
 
 
 18
 Appellant's App., Vol. I at 170. Judgment was entered in favor of Mayflower.
 
 
 19
 Coast filed a post-trial motion for judgment as a matter of law. In denying Coast's motion, the district court clarified its earlier ruling on the ambiguity of the hold-harmless clause:
 
 
 20
 In the Court's ruling on the parties' motions for summary judgment, the court found paragraph 5 of the parties' agency agreement was ambiguous to the extent that it did not clearly determine whether Mayflower or Coast assumed the risk for the accident in question. Paragraph 5 of the parties' agency agreement states: "the agent [Coast] agrees to ... indemnify and hold harmless the company [Mayflower] against any wrongful or unauthorized act that is beyond the scope of this agreement which results in a claim against the company." It is undisputed that Garcia acted wrongfully when he operated his truck while intoxicated. However, the Court could not find that Coast assumed this risk as a matter of law. The plain meaning of the agency agreement contemplated that some wrongful, or unauthorized, acts by Coast's drivers were within the scope of the parties' agreement. Therefore, the issue before the jury was whether the intentions of the parties, as expressed in their agreements, intended Mayflower or Coast to assume the risk of this accident. The jury found that Coast agreed to indemnify Mayflower for this type of accident. The Court finds that there was sufficient evidence for the jury to return a verdict in favor of Mayflower and, therefore, the Court denies Coast's motion for judgment as a matter of law.
 
 
 21
 Appellant's App., Vol. I at 12-13.
 
 DISCUSSION
 I. JURISDICTION AND STANDARDS OF REVIEW
 
 22
 Because our jurisdiction is founded upon diversity of citizenship, 28 U.S.C. 1332, we apply the substantive law of the forum state, in this case, New Mexico. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co., 962 F.2d 1484, 1486 (10th Cir.), cert. denied, 113 S.Ct. 411 (1992). We review the state law determinations made by the district court de novo, according no deference. Salve Regina College v. Russel, 499 U.S. 225, 231 (1991). While Erie dictates that we apply the substantive law of the forum state, including its choice of law rules, see Budd v. American Excess Ins. Co., 928 F.2d 344, 347 (10th Cir.1991), "as a matter of independent federal procedure we utilize the normal federal standards of appellate review to examine the district court's decision process." Mid-America Pipeline Co. v. Lario Enter., Inc., 942 F.2d 1519, 1524 (10th Cir.1991).
 
 
 23
 Therefore, we review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir.1994). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate only if the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Leadville Corp. v. United States Fidelity & Guar. Co., No. 94-1386, 1995 WL 313054 (10th Cir. May 23, 1995); Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir.1991); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 
 24
 The standard for what used to be termed a directed verdict (now an order for judgment as a matter of law under Fed.R.Civ.P. 50(a) or 50(b)) is identical to the standard for summary judgment under rule 56. Pendleton v. Conoco Inc., 23 F.3d 281, 286 (10th Cir.1994). Accordingly, we review the district court's denial of the motions de novo, applying the same legal standard to each. F.D.I.C. v. United Pacific Ins. Co., 20 F.3d 1070, 1079 (10th Cir.1994). Under this standard, as with summary judgment, we may find error in the denial of a motion for judgment as a matter of law "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion; we must construe the evidence and inferences most favorably to the nonmoving party.' " Id. (quoting Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir.1991)).
 
 II. CHOICE OF LAW
 
 25
 Before addressing the contract issues presented in this case, we first must determine which law applies. In interpreting a contract, New Mexico courts apply the substantive law of the state where the last act necessary for the formation of the contract was performed. Eichel v. Goode, Inc., 680 P.2d 627, 631 (N.M. Ct.App.1984); see Miller v. Mutual Beneficial Health & Accident Ass'n, 415 P.2d 841, 843 (N.M.1966). In this case, the final act in the formation of both the agency agreement and the equipment lease was the signing of the agreements by Mayflower in Indiana. Thus, Indiana law controls interpretation of the contracts at issue in this case.
 
 III. THE INDEMNIFICATION AGREEMENT
 
 26
 As an initial matter, we note that federal regulations require Mayflower, as the interstate carrier, to maintain minimum levels of liability insurance coverage for "any final judgment recovered against such motor carrier for bodily injuries to or death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation." 49 C.F.R. 1043.1(a)(1). Thus, as the interstate lessee, Mayflower was directly, and ultimately responsible for damages arising from Mr. Garcia's accident, whether or not he was engaged in Mayflower's business at the time of the accident. See Hartford Ins. Co. v. Occidental Fire & Cas. Co., 908 F.2d 235, 237 (7th Cir.1990); Planet Ins. Co. v. Transport Indem., 823 F.2d 285, 288 (9th Cir.1987).
 
 
 27
 Federal regulations, however, are indifferent as to how the lessor and lessee may contractually apportion liability. See 49 C.F.R. 1057.12(j) (citing "bobtail insurance" as an example of how the lessor and lessee may apportion ultimate liability). Moreover, the Supreme Court has specifically held that "[a]lthough one party is required by law to have control and responsibility for conditions of the vehicle, and to bear the consequences of any negligence, the party responsible in law to the injured or damaged person may seek indemnity from the party responsible in fact." Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc., 423 U.S. 28, 40 (1975). The question before us, therefore, is not whether Coast could have contractually agreed to indemnify Mayflower. Clearly, under federal law such a contractual arrangement is permitted. Rather, our inquiry is whether, under Indiana law, Coast in fact agreed to hold harmless and indemnify Mayflower for damages arising out of this accident.[9]
 
 
 28
 The district court found an ambiguity in the hold harmless clause[10] which provided that Coast would indemnify Mayflower for "any wrongful or unauthorized act that is beyond the scope of this agreement." Specifically, the court was unable to determine the precise "scope of this agreement," finding that the wording was such that some wrongful or unauthorized acts would be within the scope of the agreement while others would necessarily lie outside the scope of the agreement. Thus, the court concluded, the contract was ambiguous. Whether a contract is ambiguous is a question of law which we review de novo. In re Kaiser Steel Corp., 998 F.2d 783, 789 (10th Cir.1993); In re Amarex, 853 F.2d 1526, 1530 (10th Cir.1988).
 
 
 29
 In interpreting the written contract, we must apply the "four corners" rule and "determine the intent of the parties at the time of execution as revealed by the language they chose in expressing their rights and responsibilities." Anderson v. Horizon Homes, Inc., 644 N.E.2d 1281, 1290 (Ind. Ct.App.1995); R.R. Donnelly & Sons, Co. v. Henry-Williams, Inc., 422 N.E.2d 353, 356 (Ind. Ct.App.1981); see Hauck v. Second Nat'l Bank, 286 N.E.2d 852, 861 (Ind. Ct.App.1972). We ascertain the meaning of the contract by considering all its provisions, not "individual words, phrases or paragraphs read alone." Evansville-Vanderburgh Sch. Corp. v. Moll, 344 N.E.2d 831, 837 (Ind.1976). Indeed, we must construe the language of the contract so as not to render any words, phrases, or terms ineffective or meaningless. Bicknell Minerals, Inc. v. Tilly, 570 N.E.2d 1307, 1316 (Ind. Ct.App.1991). In short, we must accept an interpretation of the contract which harmonizes its provisions as opposed to a reading which would cause conflict among the various contractual provisions. See Hauck, 286 N.E.2d at 861.
 
 
 30
 Under Indiana law, where the terms of a contract are clear, the meaning of the contract is determined as a matter of law. Horizon Homes, 644 N.E.2d at 1290. Where the contract is ambiguous, however, and its meaning cannot be gleaned from the four corners of the instrument, the intent of the parties is a question of fact and resort may be made to extrinsic evidence. Id. If reasonable people would find the contract subject to more than one construction, an ambiguity exists. Id.; Adult Group Props., Ltd. v. Imler, 505 N.E.2d 459, 466 (Ind. Ct.App.1987); see Kordick v. Merchants Nat'l Bank & Trust Co., 496 N.E.2d 119, 125 (Ind. Ct.App.1986). However, "an ambiguity is not established by the mere fact that the parties assert different interpretations of the contract." Tucker v. Richey, 448 N.E.2d 1206, 1210 (Ind. Ct.App.1983), vacated on other grounds, 460 N.E.2d 964 (Ind.1984); see PPG Indus., Inc. v. Russell, 887 F.2d 820, 823 (7th Cir.1989).
 
 
 31
 In this case, the purpose of the lease agreement is clearly set forth in the contract:
 
 
 32
 [Coast] has available certain suitable motor vehicle equipment for use in the service of Aero Mayflower Transit Company, Inc., hereinafter called Company, and is desirous of making said equipment available to said Company for its use and operation in its service as a common carrier of property by motor vehicle over the highways in accordance with authorities issued to Company by certain state and provincial regulatory boards and commissions and by the Interstate Commerce Commission in Certificate MC-2934, and the Company is desirous of acquiring the use of said equipment.
 
 
 33
 Appellant's App., Vol. I at 367. Paragraph 2 of the contract then defines the scope of such "use":
 
 
 34
 [Coast] agrees that said vehicular equipment shall be used exclusively in the business and service of Company, and to perform all such acts as are incidental to the use thereof, including loading and unloading and to fully comply with applicable rules, regulations, policies, tariffs of Company and all regulatory authorities vested with control of such operations.
 
 
 35
 Id. (emphasis added). These two provisions unambiguously establish that the scope of the agreement is the "use" by Coast of its equipment, in compliance with all applicable regulations and Mayflower company policy, to service Mayflower's interstate trucking needs.
 
 
 36
 While reasonable persons may disagree whether a particular act on the part of a driver falls beyond the perimeter of the agreement so as to trigger the hold-harmless provision, this does not establish an ambiguity in the contract itself. See Tucker, 448 N.E.2d at 1210. We agree with the district court that the phrase "beyond the scope of this agreement" appears at first blush to be unclear. However, "[e]ven when an ambiguity is apparent, the instrument is not deemed ambiguous until the four corners of the instrument have been searched to ascertain whether it affords a clear understanding of what the parties intended." 100 Ctr. Dev. Co. v. Hacienda Mexican Restaurant, Inc., 546 N.E.2d 1256, 1258 (Ind. Ct.App.1989).
 
 
 37
 A reading of the entire lease agreement, as opposed to a narrow examination of the hold-harmless clause, reveals that ICC regulations figure prominently into the contract and that compliance with these regulations is part and parcel of the lease.[11] It would be absurd to conclude, therefore, that the parties intended a driver acting in blatant violation of federal regulations and state law to be operating within the "scope of the agreement." At the time of the accident, Mr. Garcia was operating his vehicle in violation of 49 C.F.R. 392.5, N.M. Stat. Ann. 66-8-102(C), and Mayflower Company Policy, see Appellant's App., Vol. II at 65-66. His conduct clearly was outside the scope of the agreement and we do not believe that "reasonable persons would honestly differ" on this point. See Sell v. United Farm Bureau Family Life Ins. Co., 647 N.E.2d 1129, 1131 (Ind. Ct.App.1995). Accordingly, we hold that the district court erred in concluding as a matter of law that the contract between Mayflower and Coast was ambiguous. The error was harmless, however, because viewing the evidence in the light most favorable to Mayflower, Coast clearly would not have been entitled to judgment as a matter of law.[12] Thus, the district court properly denied Coast's motions for summary judgment, a directed verdict, and judgment as a matter of law.
 
 IV. THE INSURANCE CONTRACT
 
 38
 Coast next argues that the district court erred in denying its motions for summary judgment, a directed verdict, or judgment as a matter of law, arguing that "Mayflower as insurance carrier for Coast to Coast, could not deny coverage, or seek subrogation from its own insured." Appellant's Br. at 13. The main thrust of Coast's argument on this point is that Mayflower required its agents to contribute to the PL/PD program in exchange for liability coverage. Thus, Coast maintains, Mayflower became an insurer under Indiana law and cannot now avoid coverage.
 
 
 39
 Mayflower, on the other hand, argues that the coverage in place at the time of the accident specifically excluded bobtailing and bobtail deadheading from coverage under the PL/PD program and because Mr. Garcia was deadheading, Coast must bear the loss. Alternatively, Mayflower claims that Coast was not covered under either policy because Mr. Garcia was not operating his equipment "by or for the carrier," Mayflower, at the time of the accident. See 49 C.F.R. 1057.12(c)(3).
 
 
 40
 Because our inquiry in reviewing the district court's denial of Coast's motion for judgment as a matter of law asks whether there was evidence such that a jury could have properly found in favor of Mayflower, we necessarily must frame our analysis in terms of the underlying burden of proof. Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir.1990), cert. denied, 500 U.S. 905 (1991). Under Indiana law, as part of the prima facie case an insured bears the burden of proving facial coverage under the insurance policy. See Town & Country Mut. Ins. Co. v. Sharp, 538 N.E.2d 6, 9 (Ind. Ct.App.1989). Once facial coverage is established, coverage exclusion is an affirmative defense, proof of which is the insurer's burden. Rozek v. American Family Mut. Ins. Co., 512 N.E.2d 232, 234 (Ind. Ct.App.1987).
 
 
 41
 At trial, the district court instructed the jury that Coast had the burden of proving that Mayflower was an insurer of Coast. Appellant's App., Vol. I at 148 (Instruction No. 4). This was a correct statement of Indiana law. The court further instructed the jury that an insurance policy is a contract in which one party agrees to assume losses caused by certain risks or hazards, in return for the payment of a premium by the party to be insured. Id. at 161 (Instruction No. 17). This instruction also accurately summarized Indiana law. See Ind.Code. Ann. 27-1-2-3(a) (West 1995).
 
 
 42
 At trial, the parties were in dispute as to which policy--the first or second policy update--was in effect at the time of the accident. Thus, that determination was properly left to the jury.[13] The jury heard testimony on this issue from James Reichert, Mayflower's general counsel, see Appellant's App., Vol. II at 74, and from Susan Schmidt, Coast's president, see id. at 279. Ms. Schmidt acknowledged that as of August 1, 1990, the rate charged by Mayflower for PL/PD coverage dropped and that she was aware at that time of the change. Id. at 279-80. From this testimony, the jury reasonably could have concluded that the second policy, which excluded bobtailing and deadheading from coverage, was in effect at the time of the accident.
 
 
 43
 Uncontroverted trial testimony from Mr. Reichert and Ronald Gazda, an expert witness called by Mayflower, established that Mr. Garcia's departure from his route was bobtail deadheading, Appellant's App., Vol. II at 188, or bobtailing, see id. at 59. Viewed in a light most favorable to Mayflower, this evidence supports Mayflower's affirmative defense that, under the second PL/PD policy, the loss was excluded from coverage because Mr. Garcia was deadheading.
 
 
 44
 We find ample support in the record for the jury's determination that Mayflower did not agree to insure Coast to Coast for the accident which occurred in this case. Thus, the district court properly denied Coast's motion for judgment as a matter of law on this issue.[14]
 
 V. STATUTORY EMPLOYEE CLAIM
 
 45
 Coast's final argument is that Lucas Garcia was a statutory employee of Mayflower and that, as such, Mayflower is responsible to Coast for Mr. Garcia's actions. In support of this contention, Coast cites to Rodriguez v. Ager, 705 F.2d 1229 (10th Cir.1983). Coast claims that "Rodriguez effectively held an agent hauling a load for an interstate carrier, in a truck with the carrier's logo and ICC number, had to be operating within the scope of an agency or equipment lease." Appellant's Br. at 22. Coast further represents that "this court held in Rodriguez that: federal law in effect creates an irrebuttable presumption of an employment relationship between a driver and the lessee whose placards identify the vehicle.' " Id. at 23-24 (quoting Rodriguez, 705 F.2d at 1234).
 
 
 46
 We find nothing in the record or our prior case law to support Coast's position. First, the precise issue before this court in Rodriguez was not whether parties to a lease could contractually allocate liability, but rather whether the trial court had erred in not ruling that the interstate lessee was legally responsible for injuries suffered by members of the public. Rodriguez, 705 F.2d at 1230. In Empire Fire & Marine Ins. Co. v. Guarantee Nat'l Ins. Co., 868 F.2d 357 (10th Cir.1989), we commented on the relevance of Rodriguez: "Rodriguez is instructive on the issue of a lessee's responsibilities to injured parties under ICC regulations, but it is not relevant to the issue of how liability should be allocated between two insurance companies...." Id. at 363.
 
 
 47
 In addition, we did not hold in Rodriguez that federal law creates an irrebuttable presumption that a driver is the "statutory employee" of the interstate lessee. Rather, we simply reiterated, through quotation, the policy enunciated by the Third Circuit in Carolina Casualty Ins. Co. v. Insurance Co. of N. Am., 595 F.2d 128, 137 n. 29 (3d Cir.1979), that a driver operating under the interstate lessee's ICC certificate is, vis--vis the public, the equivalent of an employee of the lessee in that the lessee may not disclaim ultimate liability for damage caused by the driver. In addition to quoting Carolina Casualty out of context, Coast overlooks the ultimate holding in the case: "[N]othing in the federal motor carrier requirements ... alter any party's rights ... to contribution. In particular ..., those provisions do not impose on [the interstate lessee] the status of an insurer with respect to [the lessor]." Id. at 143-44.[15]
 
 
 48
 In short, Coast has simply misconstrued federal regulations which require an interstate lessee to assume ultimate responsibility for any damage to the public or shippers with the permissible scope of contractual allocation of risk between the interstate lessee and its lessor. Rodriguez and the cases cited by Coast in support of its claim addressed the former; the case now before us invokes the latter. Accordingly, we affirm the district court's denial of Coast's motion for judgment as a matter of law as to this point.
 
 
 49
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The Honorable Arthur L. Alarcn, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation
 
 
 [3]
 The amount of the settlement was $650,000 to Barbara Dietrich and $95,000 to Albertsons. Mayflower and TIE each paid fifty percent of the settlement
 
 
 [4]
 Mayflower initially filed this action, seeking a declaratory judgment as to its liability. Prior to trial, however, the parties moved for realignment in order to more accurately reflect the true posture of the case. The case then proceeded with Barbara Dietrich, the surviving spouse of Dale Dietrich, the Albertsons driver, as the plaintiff. Mayflower and Coast were named as codefendants
 
 
 [5]
 "Bobtailing" and "deadheading" are terms which are common in the trucking industry. While the terms are not amenable to precise definition, see Horn v. Transcon Lines, Inc., 7 F.3d 1305, 1307 (7th Cir.1993) ("bobtailing" generally refers to travel with an empty trailer); United Transp. Union v. Skinner, 975 F.2d 1421, 1427 (9th Cir.1992) (deadheading, a term with its genesis in the railroad, refers to the time that an employee is off-duty and traveling between duty assignments); Ryder Truck Rental Co. v. UTF Carriers, Inc., 719 F.Supp. 455, 460 n. 10 (W.D.Va.1989), aff'd, 907 F.2d 34 (4th Cir.1990), uncontroverted testimony in this case established that Mr. Garcia was either deadheading or bobtailing
 
 
 [6]
 The agency agreement contained essentially the same hold-harmless provision:
 Each party hereto agrees to indemnify and hold harmless the other party hereto against any wrongful or unauthorized act on the part of either party that is beyond the scope of this agreement which results in a claim against the other, and each agrees promptly to reimburse the other for any money or obligation, including the expense of defense and investigation, paid or incurred in the disposition of any claim resulting from any such act on the part of the other.
 Appellant's App., Vol. I at 372.
 
 
 [7]
 Pursuant to federal requirements that the lease reflect the lessee's assumption of liability, the Mayflower-Coast lease contained the following provision:
 Company hereby assumes the full responsibility of a common carrier, pursuant to the provisions of the Federal Motor Carrier Act of 1935, and the Interstate Commerce Commission regulations relating thereto, to the shipper for the delivery of the cargo transported in any of such equipment under an "Order for Service" and "Bill of Lading" of Company; Company further hereby assumes the full responsibility of such a carrier to the public and Agent with respect to injury to, or death of, any person or persons, except the owner, driver of, or helpers on any such equipment, and with respect thereto Company assumes no responsibility for loss of any kind to the owner, driver of, or helpers on any such equipment, including property; and with respect to damage to the property of others occasioned or resulting from the operation of any such equipment on the business of the Company, the Company shall assume responsibility. Provided; however, that should the agent elect, under the Company's present established policy and so long as such policy is in operation, to provide acceptable insurance coverage at his own cost on his equipment placed in the Company services under this agreement, the Agent may do so with the consent of the Company.
 Appellant's App., Vol. I at 368; see 49 C.F.R. 1057.12.
 
 
 [8]
 Mayflower maintains an agent's manual which it supplements with periodic updates. The changes in the PL/PD policy were communicated to the agents via these updates. The first policy update provided that "[b]obtail and bobtail deadhead coverages are included," Appellant's App., Vol. I at 376, while the second policy update provided that "[a]ny claim arising from bobtailing, including undispatched deadheading, do not arise from operations under Mayflower's ICC authority, and are excluded from this coverage," id. at 379
 
 
 [9]
 Coast argues that the following language contained in the equipment lease definitively establishes that Mayflower insured Coast against this loss: "Company [Mayflower] further hereby assumes the full responsibility of such carrier to the public and Agent [Coast] with respect to injury to, or death of, any person or persons...." Appellant's Br. at 13
 Under Coast's theory, by including the ICC's mandated language in its lease agreements, see 49 C.F.R. 1057.12(c), an interstate lessee would never be able to contractually allocate liability to the lessor agent. This is precisely the interpretation, however, which was specifically rejected by the Supreme Court in Brada Miller, 423 U.S. at 40. See also Budd v. American Excess Ins. Co., 928 F.2d 344, 348 (10th Cir.1991); Hartford Ins. Co. v. Occidental Fire & Cas. Co., 908 F.2d 235, 238 (7th Cir.1990). It is clear that the ICC required language is intended to ensure that the public is adequately protected when a licensed carrier uses a leased vehicle to transport goods pursuant to an ICC certificate; it does not create a blanket insurance policy running from lessee to lessor. See Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co., 868 F.2d 357, 361-62 (10th Cir.1989). Thus, we reject Coast's argument on this point.
 
 
 [10]
 While we refer to the hold-harmless provision in the singular, the reader should note that the reference is to the substantively identical hold-harmless provisions contained in both the agency agreement and the lease agreement
 
 
 [11]
 For example, the agent agreed to maintain equipment in compliance with "appropriate regulatory authorities"; the agent agreed to provide only drivers qualified under rules established by "any regulatory authority"; the agent agreed to instruct drivers "to obey the rules and regulations relating to safety, hours of service, log books, and other regulations including the Department of Transportation and all requirements of the Federal Motor Carrier Act"; and the Company assumed full responsibility of a common carrier as required by the Federal Motor Carrier Act of 1935
 
 
 [12]
 Mayflower's motion for summary judgment also was denied. The propriety of that ruling has not been challenged in this appeal
 
 
 [13]
 Coast represents in its brief-in-chief that "the parties agreed the second version of the manual was not in force at the time of the accident." Appellant's Br. at 15. At oral argument, however, Mayflower vigorously objected to this claim and we are unable to locate any support for the proposition in the record
 
 
 [14]
 We need not and, therefore, do not address Mayflower's alternative argument that Coast was not covered under either the first or second policy because Mr. Garcia was not operating "by or for the carrier" at the time
 Similarly, we need not address Coast's argument that the hold-harmless provision is void as a matter of law. Coast claims that the hold-harmless provision is unenforceable because it conflicts with the subsequently issued PL/PD policy. As the preceding discussion makes abundantly clear, however, this analysis is flawed. Coast's obligation to indemnify Mayflower arose because Mr. Garcia's driving under the influence of alcohol was both wrongful and beyond the scope of the lease and agency agreements. Wholly apart from that issue, Mayflower's PL/PD policy in effect at the time excluded bobtailing and bobtail deadheading from coverage. These are separate issues which we have resolved on different grounds. Thus, there is no conflict in the present case between the indemnification agreement and the PLPD policy.
 
 
 [15]
 We find Coast's citation to Liberty Mutual Ins. Co. v. Connecticut Indem. Co., 857 F.Supp. 1300 (N.D. Ind.1994), unpersuasive. Liberty Mutual involved a dispute over which party's insurer covered the loss at issue, that of the lessee or that of the lessor. Significantly, although the court acknowledged that the law allows the parties to a lease to agree to indemnification, see id. at 1305 n. 2, there was no further discussion of that issue. Thus, the case was resolved purely on a reading of the policies and the court's conclusion that the lessor's insurer had specifically excluded the instant loss from coverage while the lessee's policy covered the loss. Id