Jane A. STEELE, Plaintiff,

v.

CITY OF BLUFFTON, Ted L. Ellis, Mayor of City of Bluffton, Defendants.

No. 1:97 CV 0184.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 22, 1998.

---

Christopher C. Myers, Lori W. Jansen, Myers and Geisleman, Fort Wayne, IN, for Jane A. Steele, plaintiff.

Robert T. Keen, Jr., Miller, Carson, Boxberger and Murphy, Fort Wayne, IN, for City of Bluffton, defendants.

Robert T Keen, Jr, (See above), for Ted L Ellis, Mayor City of Bluffton, sued in his official and individual capacities, defendant.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

Plaintiff, Jane Steele ("Steele") instituted the present action against the City of Bluffton and its Mayor, Ted Ellis, alleging that she was terminated from her employment as the mayor's secretary for her political patronage in violation of the First Amendment. In addition, plaintiff asserted claims for age discrimination under the Age Discrimination in Employment Act, and claims that her termination, nine months shy of vesting in the Public Employment Retirement Fund ("PERF"), violated the Employee Retirement Income Security Act ("ERISA").[1]

Presently before the court is Defendants', the City of Bluffton ("City") and Ted L. Ellis ("Ellis," collectively, the "defendants") Motion for Summary Judgment filed on June 25, 1998. Steele responded in Opposition to Defendants' Motion for Summary Judgment on July 24, 1998. Defendants' Reply was filed on August 14, 1998 making the issues ripe for review. Because of issues raised in the briefs submitted by the parties, however, the court held a hearing on October 23, 1998 at which time it ordered additional briefing on the age discrimination claim. Supplemental briefing was completed on November 23, 1998. Thereafter, on December 2, 1998, the court held a second hearing to clarify the state of the record. At that hearing, the court indicated that the pending motion would be taken under advisement for a short period. At this time, the court shall now enter its Memorandum of Decision and Order. For the following reasons, defendants' motion for summary judgment will be GRANTED as to all claims.

### APPLICABLE STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452,

---

1. Plaintiff also raised a state law claim for accrued vacation pay which she subsequently dismissed.

455 (7th Cir.1996); *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

## BACKGROUND

In September, 1986, Mayor Fryback, the then Democratic Mayor of Bluffton, hired Steele as his secretary. (Deposition of Jane Steele, p. 7; hereinafter "Steele Dep. p. ___"). According to Steele, Fryback initially interviewed her for the position. However, during her second interview, Fryback asked R.D. Esmond ("Esmond"), the utilities manager, to be present. (Steele Dep. p. ___). Although Fryback ultimately hired her, Steele testified that she believed her immediate supervisor was Esmond. (Steele Dep. p. 9).

The job description, as described by Steele herself, involved handling the mayor's typing, answering his phones and greeting visitors entering his office corridor. (Steele Dep. p. 9). Steele's secretarial office was located in an adjoining space designated by an office sign stating "Mayor's Office." (Steele Dep. p. 11). An additional sign in the office reflected Steele as the mayor's secretary. (Steele Dep. p. 11).

Although Steele admits that she was hired as the mayor's secretary (Steele Dep. p. 7), Steele states that she reported jointly to Fryback and Esmond regarding her daily work activities. (Steele Dep. p. 9). According to Esmond, he signed Steele's time sheets but could not authorize vacation time for Steele without the consent of the Mayor. (Deposition of R.D. Esmond p. 6; hereafter "Esmond Dep. p. ___"). Likewise, any pay raises attributed to Steele were obtained only after recommendation and approval by the Mayor and the Board of Works. (Esmond Dep. p. 19).

In addition to her work for Mayor Fryback, Steele testified that she performed limited work for the utility department at the direction of Esmond. (Steele Dep. p. 9). Specifically, Steele performed typing tasks and routine paperwork which accounted for an estimated one-quarter of her time worked. (Steele Dep. p. 10). Esmond testified that he took Steele typing assignments "periodically" and under no "set schedule." (Esmond Dep. p. 11)

After Fryback's term of office expired, Steele continued as secretary for the new Democratic Mayor, Faulkner. (Steele Dep. p. 12). During Faulkner's term, Steele admits that he supervised and controlled her day to day activities. (Steele Dep. p. 14). Steele testified that during the Faulkner administration her workload for the utilities department increased ("They [the job duties] seemed to get more and more all the time. There was more paperwork to be done") and she began investigating violations of city ordinances. (Steele Dep. pp. 15, 16).

Faulkner failed to seek re-election and was replaced by Democrat, Ted Ellis. Steele, a Democrat, states that she did not take an active role in politics. (Steele Dep. p. 20). Likewise, Steele testified that she did not support any of the opposition candidates against Ellis. (Steele Dep. p. 20). Despite

her lack of political involvement, on January 6, 1996, within a week of his taking office, Ellis terminated Steele's employment as his secretary. According to Ellis, he terminated Steele because he did not think her style, attitude and approach were appropriate for his office. (Deposition of Ted Ellis, p. 9; hereafter "Ellis Dep. p. ___"). In his interrogatory responses Ellis testified:

> I was acquainted with the plaintiff prior to taking office as the Mayor of Bluffton on January 1, 1996. I was active in various community activities and frequently interacted with the Mayor's office, and became familiar with the Mayor's staff, including the former Mayor's secretary, Jane Steele. Based upon my experience with Steele, I was of the opinion that Steele was unfriendly and uncooperative. I decided to terminate Steele's employment because my working style and her personality were incompatible.[2]

In his deposition, Ellis stated that his final decision to terminate Steele arose because of negative comments he received concerning Steele's job performance while in the community:

> A. The impressions that I received from City employees and citizens alike was an impression that Ms. Steele was generally not very hospitable toward people who came into the office. Generally somewhat domineering, her treatment of City employees.
>
> Q. Were those considerations that you had when you made the decision to terminate Ms. Steele?
>
> A. Yes.
>
> Q. Was it your desire to have your secretary take a different approach with City employees and citizens of the City, as well?
>
> A. Yes, it was.

(Ellis Dep. p. 31). In the City's EEOC position statement, it stated "Mayor Ellis felt that he could not rely upon Steele to keep sensitive information in confidence or deal professionally and courteously with those doing business with his office and felt that she was not a good reflection of the attitude of his administration." (EEOC Position Statement, p. 2).

In addition to the "different approach," Ellis testified that the essential functions of the secretary's job under his administration included meeting and receiving persons coming into the his office, carrying out his instructions, and maintaining confidentiality relating to personnel matters, business inquiries and tax abatement issues. (Ellis Dep. p. 6–7). Further, under his administration, the secretary would have only incidental contact with the utility department. (Ellis Dep. p. 8).

Prior to her termination, Steele was making an hourly wage of $9.50, was enrolled in health insurance through the city and maintained a retirement account with PERF. To be eligible to receive retirement payments from the Indiana PERF system, an employee must "vest" in the plan, i.e., remain in the public's employ for ten (10) years. Steele was scheduled to vest in the plan in September, 1996. Knowing this, Steele testified that at the January 6, 1996 meeting she requested to be transferred to another position or to take an unpaid leave of absence so that she could receive her retirement benefits. (Steele Dep. pp. 22, 71). Defendants admit in their response to plaintiff's request for admissions that Steele did request a transfer at the time of her termination. (Defendant's Response to Requests for Admissions No. 7). In deposition, however, Ellis states that he does not recall Steele mentioning that she would soon vest in PERF or that she would be willing to transfer positions. (Ellis Dep. pp. 12, 15).

Steele was 51 when she was terminated. Thereafter, Ellis hired Brenda Holloway

---

**2.** The court notes that this interrogatory response was the subject of a Motion to Strike filed by the plaintiff in response to defendant's reliance on the interrogatory in its supplemental brief filed with the court. The motion was based upon the plaintiff's view that the court indicated at the initial hearing that it was closing the evidentiary record for summary judgment purposes. However, as the court noted in the December 2 hearing, this interrogatory response has always been part of the evidentiary record in the case, although defendant inadvertently failed to file it with the court with its motion for summary judgment. For this reason, the court indicated that it would not preclude defendant's use of the interrogatory response.

("Holloway") as Steele's replacement. At that time, Holloway was 34 years old.

### DISCUSSION

#### I. *First Amendment Claims*

In her first count, Steele alleges that Ellis discharged her because of her political patronage and that termination for such patronage is impermissible under the First Amendment. Defendants, while denying Steele's politics played any part in her termination, assert that even had Steele's political associations been the key factor, her termination falls within the *Elrod/Branti* exception for confidential employees noted in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Before considering the merit of plaintiff's claim, a review of these seminal cases in the area of patronage dismissals is in order.

The Supreme Court has set forth the law regarding political patronage in a trilogy of cases beginning with *Elrod v. Burns*. In *Elrod v. Burns*, the Supreme Court, in a plurality opinion, held that the discharge of a government employee because of his political affiliation violates the freedom of association clause of the First Amendment. 427 U.S. at 373, 96 S.Ct. at 2689–90. The case involved the election of a Democratic Sheriff of Cook County, Illinois who, upon taking office, terminated the employment of deputy sheriffs who were not members or who did not otherwise support the Democratic party. In finding that such a practice violated the First Amendment, the Supreme Court generally ended the practice of "cleaning house," whereby the prevailing political party would fire many employees of the losing party, including those positions holding little or no political responsibility and give the vacant positions to loyal supporters. The court did not, however, eliminate all political nepotism by newly-elected officials. Rather, the court carved out an exception to its ruling, stating that political affiliation may be an acceptable requirement for certain types of government employment. *Id.* at 367, 96 S.Ct. at 2686–87.

In creating this exception, the Court first reaffirmed the well-established principle that "a significant impairment of First Amendment rights must survive exacting scrutiny." 427 U.S. at 362, 96 S.Ct. at 2684–85. Accordingly, the Court determined that where an employee's patronage was the rationale for his termination, the alleged need for political loyalty would survive exacting scrutiny as a rationale only if the employee was employed in a "policymaking position." *Id.* at 367–68, 96 S.Ct. at 2686–87. Under this analysis, the Court exempted policymaking employees from the general prohibition against terminating employees based on political affiliation. *Id.* at 372, 96 S.Ct. at 2689. As a result, the Court granted protection from termination on the sole ground of political beliefs only to nonpolicymaking, nonconfidential government employees. *Id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). The resulting dilemma, as the Court acknowledged, was determining which employees qualified as nonpolicymaking, nonconfidential employees:

> [n]o clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical.... An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

*Id.* at 367–68, 96 S.Ct. at 2687.

Three years later, in *Branti v. Finkel*, a case involving the threatened discharge of assistant public defenders on political grounds, the Court reformulated its position with respect to the distinction between policymaking and nonpolicymaking positions in *Elrod*. While the premise in *Elrod*, that political affiliation is a legitimate factor for some government employment, remained intact, the Court rearticulated the critical inquiry for identifying those employees falling within the *Elrod* exception:

In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95. Thus, *Branti* concludes that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show the appropriateness of party affiliation to the particular office involved. *Id.*

The third case, *Rutan v. Republican Party of Illinois,* reaffirms the principles of *Elrod* and *Branti* while extending First Amendment protections to other patronage practices, including "promotions, transfers, and recalls after layoffs based on political affiliation or support." 497 U.S. 62, 75, 110 S.Ct. 2729, 2737, 111 L.Ed.2d 52 (1990). As a result, the First Amendment protections now extend to a multitude of adverse employment actions.

Having articulated the Supreme Court's stance on this issue, the court must now examine Steele's claim to determine if she has presented evidence, which, if true, could support her claim that her dismissal from employment violated the Supreme Court's holdings in *Elrod* and *Branti.* The parties spend significant time debating whether, by virtue of her overflow duties into other departments, Steele was the Mayor's secretary or whether she was an employee of the utilities department. Steele does not contend that she did not act as the Mayor's secretary. Indeed, in her complaint and other submissions to the court Steele admits that she was

hired as the Mayor's secretary. Rather, she argues that she was formally classified by the City, not as the Mayor's secretary but, as a utilities department employee because Esmond: (1) signed her time sheets; (2) approved her time off; (3) approved her raises; and (4) signed off on her weekly paychecks.[3] (Plaintiff's Response Brief, p. 6). Under plaintiff's analysis, as a utilities department employee, her position would not be one in which political affiliation would be an appropriate consideration under *Branti.* Consequently, plaintiff's discharge for her politics would violate the First Amendment. In contrast, Defendant contends that because the Mayor maintained ultimate responsibility and authority over Steele's work, she was the mayor's secretary and, under *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir.1991), a confidential employee who may be terminated for political reasons.

■ Under the law of political patronage, Defendants bear the burden of establishing that plaintiff's position falls within the exception created in *Elrod* and *Branti* for certain policy-making or confidential positions. *See Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687; *Matlock v. Barnes,* 932 F.2d 658, 663 (7th Cir.1991), *certiorari denied,* 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247. In the context of this political patronage case, *Elrod* and *Branti* require examination only of the powers inherent in the position plaintiff holds. The court is not required to entertain a fact-finding expedition to determine plaintiff's official job title or which department had ultimate authority over the terms and conditions of her employment.[4] Accepting the facts favorably to plaintiff, at a minimum,

**3.** According to plaintiff, Esmond, signed off on her paychecks every week and approved her pay increases. (Plaintiff's Response, p. 6). However, Esmond's deposition testimony does not reflect this to be accurate. Esmond's testimony reflects that he "only signed time sheets." (Esmond Dep. p. 6) and that all other job related issues, including pay raises for Steele, were approved jointly by he and the Mayor or solely at the discretion of the Mayor. (Esmond Dep. p. 11). Steele also asserts that she reported "jointly" to the Mayor and Esmond. However, an accurate account of Steele's deposition reflects that Esmond only directed her in regard to the work he provided her. (Steele Dep. p. 9). As Steele stated, "If he had typing that needed to be done, he brought it over to me. If he needed any

help in the utility department, in regard to the typing, or any type of paperwork, he would bring it over." Clearly, from this testimony, Esmond did not have a final word as to the terms of Steele's employment.

**4.** As this court's colleagues in Illinois recently stated, "Case law has made clear for over two decades that labels are not the key to determining whether a position is 'policymaking' for purposes of the 'exception.' " *Barner v. City of Harvey,* 1998 WL 664951 at \*54 (N.D.Ill. Sept.18, 1998) (citing *Flenner v. Sheahan,* 107 F.3d 459, 463 (7th Cir.1997) ("As early as 1975, this court rejected the notion that labels or job title are relevant to the inquiry into whether patronage dismissal is permissible.")).

she was the mayor's secretary and performed auxiliary duties for the utilities department. The Seventh Circuit has specifically stated that "as of 1993, the law was clear that the permissibility of dismissing an employee for patronage reasons was determined by reference to the inherent powers of the particular office, not to the title of that office." *Flenner v. Sheahan,* 107 F.3d 459, 464 (7th Cir.1997). Thus, for purposes of this court's analysis, plaintiff's attempt to avoid summary judgment by changing her label from mayor's secretary to utilities department employee is a distinction without a difference and the court must proceed to examine whether inherent in Steele's job there exist tasks for which party affiliation is an appropriate requirement.

When analyzing whether a particular position is the type for which political affiliation is a requirement, "the actual past duties of the discharged employee are irrelevant if the position inherently encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance." *O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.), cert. denied, 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). Thus, Steele's actual duties are not the starting point for the analysis; rather, the court must examine the position itself to make this determination. In particular, the court must examine the position of mayor's secretary to determine whether, even if Steele's actual duties exceeded the normal scope of the duties a mayor's secretary performs, it is a confidential or policymaking position.

On this issue, the court finds compelling the reasoning in *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir .1991), cited by defendants. In *Faughender,* the former mayor's secretary brought suit contending that she was discharged due to her political patronage in violation of the First Amendment. Specifically, Faughender contended that as the mayor's secretary she did not maintain an inherently political position. The Sixth Circuit, in granting summary judgment in favor of the City, applied the *Branti* test and held that the duties of a mayor's secretary were inherently political. *Id.* at 913. As the court stated:

Faughender's evidence, taken in the light most favorable to her, merely shows that she may not have performed political or policy-oriented tasks as secretary to the Mayor. It does not show that the position of secretary to the mayor is inherently unpolitical. Indeed, how could she show that? The mayor of a city is the supreme administrative agent of the government, clearly a policymaker of the highest order. In those cities where the mayor also sits on the City Council, the mayor also has wide-ranging legislative powers. All of these duties require communication with subordinates or other political actors, and most of those communications can be efficiently handled only through the mayors' office. Therefore, the inherent duties of a mayor's secretary can be summarized as follows: A mayor's secretary must undertake those functions in relation to the flow of information, whether by writing, speech, or personal visit, to and from the mayor's office, that the mayor wants the secretary to perform.

A particular secretary's duties may be circumscribed, but the function of the office is constant. *As political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political. Viewed in its functional aspect, a mayor's secretary is clearly the type of position that involves access to confidential and political material, and political loyalty, whether partisan or personal, is an essential attribute of the job.*

927 F.2d at 913–914 (emphasis added). Thus, the court concluded, as a matter of law, that the position of Mayor's secretary was inherently political and required political affiliation.

Defendant's reliance on *Soderbeck v. Burnett County Wisconsin,* 752 F.2d 285 (7th Cir.1985) and *Soderstrum v. Town of Grand Isle,* 925 F.2d 135 (5th Cir.1991) is also persuasive. In *Soderbeck,* the Seventh Circuit acknowledged that a confidential secretary to an elected official may be terminated without violating the First Amendment. In that case, the newly elected sheriff terminated the former sheriff's secretary because she was the wife of the former sheriff. The Seventh

Circuit, in analyzing the political patronage issue stated:

"Mrs. Soderbeck was not a policy maker; but if, as the defendants argue, she was the sheriff's confidential secretary, then Kelberg could fire her without violating the Constitution ... You cannot run a government with officials who are forced to keep political enemies as their confidential secretaries, and Mrs. Soderbeck was the political enemy of her husband's political enemy."

*Soderbeck,* 752 F.2d at 288.

Likewise, in *Soderstrum,* a former secretary to the chief of police asserted a First Amendment claim against the Town alleging she was improperly discharged for political reasons. As the chief's secretary, Soderstrum did his typing and filing, was privy to confidential files and documents, and served as the dispatcher, jailer, and clerk of the Mayor's court. The Fifth Circuit, in affirming the district court's judgment, stated:

... [B]ased on a realistic understanding of the confidential relationship between secretaries and their bosses, we agree with the jury's finding that Soderstrum was a confidential employee. An incoming government official should be able to choose his personal secretary and should not be prevented by the First Amendment from replacing his defeated opponent's secretary and relative at least when that person, as in this case, has unambiguously expressed her lack of confidence in the incoming official and her unwillingness to work in the new administration.

*Soderstrum,* 925 F.2d at 141.

These cases clearly endorse the proposition that an elected official's secretary is a position for which political affiliation is required due, in part, to the close and confidential relationship which exists between the official and his personal secretary. While the court is mindful of the fact that a plaintiff's mere access to confidential information does not automatically make her a confidential employee within the meaning of *Elrod* and *Branti, see Meeks v. Grimes,* 779 F.2d 417, 420–421 (7th Cir.1985), the court is similarly mindful that the *Branti* analysis can be

satisfied if the duties of the secretarial position as envisioned by the new mayor were inherently political—at least if the new mayor entertained a good faith belief that having a secretary who could perform such duties would be necessary to implement the policies of the new administration. *Faughender,* 927 F.2d at 913–14. Ellis stated in his deposition that he envisioned the duties of his secretary to include meeting and receiving persons coming into the mayor's office, carrying out his instructions, some minimal typing, and confidentiality. (Ellis Dep. pp. 6–7). Holloway, Steele's replacement, testified that she is responsible for scheduling Ellis's appointments, managing various projects in the City, including the curbside recycling project, and that she was advised that she would be privy to confidential information which she could not disclose. (Holloway Dep. p. 8). Steele does not dispute these facts. Further, given the nature of the office, these types of services performed by Holloway evidence Ellis' desire that his personal secretary take an active role in the new administration, including a managerial or policy role in certain City projects. This is precisely the type of position cited in *Faughender* as requiring political affiliation for its effective performance. For these reasons and after construing all the facts in Steele's favor, the court finds ample justification to support the conclusion that the Steele's position is one for which political affiliation is a requirement for effective job performance.

This decision is not changed by Steele's attempts to distinguish these cases. Steele cites no cases where a secretary to an elected official has not been held to be a position for which political affiliation is a requirement. Rather, plaintiff attempts to distinguish *Soderbeck* and *Soderstrum* by arguing that in both of those cases there was evidence that the secretary had expressed animosity or was related to the newly elected official. In this case, plaintiff argues, Steele expressed only willingness to work with Ellis, she was not related to the former Mayors, nor did she express political animosity toward Ellis. Indeed, Steele argues that they were the same political affiliation.[5] While plaintiff correctly

---

5. Because the parties briefs assume that a prima facie case exists for political patronage, the issue of whether such a prima facie case of patronage

dismissal is not before the court. However, if it were, plaintiff's argument that she had no politi-

points out these factual distinctions, these arguments obfuscate the analysis this court must undertake. It matters little that Steele was not adverse to working with Ellis if the position was one which inherently encompassed tasks which made political affiliation necessary. For if it was, Ellis could discharge her if he was adverse to working with her without violating the First Amendment. As Ellis's secretary, Steele through her routine secretarial duties and expanded role in the new administration, was bound to come into contact with sensitive, confidential information as well as serve in a potential policy making role. *Faughender, Soderstrum,* and *Soderbeck* each support the conclusion that Steele's position inherently encompassed tasks, even if Steele never actually performed them, which makes political affiliation an appropriate requirement for her job. And, for that reason, the First Amendment does not protect her from politically motivated discharge. Accordingly, the court concludes that summary judgment is appropriate on her political patronage claims.

## II. *Age Discrimination*

■ The ADEA prohibits an employer from discharging an individual because of his age. 29 U.S.C. § 623(a)(1). Under the ADEA a claimant "must demonstrate that his age was 'a determining factor' in his employer's decision to terminate his employment." *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). Although age need not be the sole reason for the discharge, the claimant must show that, but for his employer's motive to discriminate against him on the basis of his age, he would not have been discharged. *Testerman v. EDS Technical Prods. Corp.,* 98 F.3d 297, 301 (7th Cir.1996) (stating that "the relevant inquiry is whether age 'tipped the balance,'

that is, whether age was a 'but for' cause of the decision to fire the plaintiff"); *Weisbrot v. Medical College of Wisconsin,* 79 F.3d 677, 680 (7th Cir.1996) (using "but for" test, citing cases).

■ An ADEA claimant may prove age discrimination by presenting direct or indirect evidence. In this case, Steele offers no direct evidence tending to prove that she was discriminated against on the basis of her age. Thus, she must attempt to meet her burden "by successfully navigating the course of shifting burdens authorized by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Mojica v. Gannett Co., Inc.* 7 F.3d 552, 561 (7th Cir.1993). To do so, plaintiff must venture through a three-step inquiry:

> First, a plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a 'legitimate, nondiscriminatory reason' for discharging the plaintiff. Finally, 'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'

*Testerman,* 98 F.3d at 302–03 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). A plaintiff successfully proffers a prima facie case when she demonstrates that she was within the protected age group, was performing her job satisfactorily, and was discharged. *Taylor v. Canteen Corp.* 69 F.3d 773, 779 (7th Cir.1995) (citing *Roper v. Pea-*

cal animosity toward Ellis, that she went out of her way to work with him, and that they were both members of the same political party undercuts her own allegations that politics motivated her dismissal. Although it is clear in *Faughender* that "politics" is not synonymous with political motivation but applies to differences of any kind including personal political differences, in *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294, the Supreme Court held that the plaintiff bears the initial burden of proving that he or she was discharged because of his or her politics. *See*

also *Nelms v. Modisett,* 153 F.3d 815 (7th Cir. 1998) ("In order to establish a prima facie case of politically motivated discharge, [plaintiff] must prove by a preponderance of the evidence that his conduct was constitutionally protected, and that the protected conduct was a substantial factor in the decision to terminate him."). Thus, in her zealous attempt to distinguish the instant facts from the facts of the cases defendants cite, Steele argues facts that would not support her claim that her "politics" or personal differences were the reason for her discharge.

body Coal Co., 47 F.3d 925, 926 (7th Cir. 1995)). Upon demonstrating a prima facie case, there arises a rebuttable presumption of age discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Even though the burden first shifts to the employer to articulate a nondiscriminatory reason for discharging the plaintiff and then shifts back to the plaintiff to show that the employer's proffered explanation is pretextual, the ultimate burden remains with the plaintiff-employee to persuade the trier of fact that the defendant-employer intentionally discriminated against him based upon his age. *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir.1996); *Taylor,* 69 F.3d at 779.

Steele asserts that she meets the requirements for a prima facie case of age discrimination because at the time of her discharge she was within the protected age group, performing her job satisfactorily and she was ultimately replaced by a substantially younger secretary. The defendants, while not conceding that Steele presents a prima facie case, argue that even assuming Steele can establish a prima facie case of age discrimination, summary judgment in their favor is appropriate on the issue of pretext. Before reaching the pretext argument, however, this court must first analyze defendants proffered rationale for discharging Steele.

▮ To rebut the prima facie case, the defendants have the burden of production to introduce admissible evidence setting forth the reasons for their actions. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. "An articulation not admitted into evidence will not suffice..: [T]he defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at fn. 9. Moreover, the proffered explanation must be legally sufficient so that if believed by a rational fact-finder, it would be a legitimate reason to terminate the plaintiff. *Id.*

▮ According to Ellis, he discharged Steele because her style was incompatible with the atmosphere he wanted in the mayor's office. Ellis stated in his interrogatory responses that, prior to his election as mayor,

he had personal experiences with Steele which created the impression that the two were incompatible. (Response to Interrogatory # 1). In particular he stated:

> I was acquainted with the plaintiff prior to taking office as the Mayor of Bluffton on January 1, 1996. I was active in various community activities and frequently interacted with the Mayor's office, and became familiar with the Mayor's staff, including the former Mayor's secretary, Jane Steele. Based upon my experience with Steele, I was of the opinion that Steele was unfriendly and uncooperative. I decided to terminate Steele's employment because my working style and her personality were incompatible.

Ellis also stated that he made the decision to terminate Steele after hearing numerous complaints from other city employees and from the general public:[6]

> The impressions that I received from City employees and citizens alike was an impression that Ms. Steele was generally not very hospitable toward people who came into the office. Generally somewhat domineering, her treatment of City employees.

(Ellis Dep. p. __). As the newly elected mayor of a small community, it is not surprising that Ellis desired to create a welcomed atmosphere between his constituency and those he employed. In particular, as Ellis responded in his EEOC position statement, "a mayor's secretary is a direct reflection on the city administration itself." (EEOC Position Statement, p. 2). Taken in this light, Ellis' explanation that Steele's alleged domineering and discourteous attitude motivated his decision is one that when reviewed by a rational fact finder could justify Steele's discharge. Further, Ellis' burden is one of production only; Ellis' testimony of his own unfavorable personal experiences with Steele, if credited by the fact-finder, is evidence of a legitimate, nondiscriminatory reason for terminating Steele. Thus, the court finds that the defendants have alleged a legitimate, nondiscriminatory reason for their action which rebuts the presumption of unlawful discrimination. Accordingly, as defendants argue, the burden shifts back to the

---

**6.** There is no evidence before the court to corroborate the alleged complaints from other individuals to Ellis. Nevertheless, the fact that Ellis did have unpleasant personal experiences with the plaintiff does, as this court holds, constitute a legitimate nondiscriminatory reason.

plaintiff to raise a genuine factual question as to whether the proffered employment reason is pretextual. *Id.*

"Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *Tincher v. Wal–Mart Stores, Inc.,* 118 F.3d 1125, 1129–30 (7th Cir.1997) (quoting, *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996)). There are three ways for Steele to show that the proffered nondiscriminatory explanation is pretextual: (1) the employer's explanation had no basis in fact; (2) the explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir.1996). To meet her burden in a summary judgment context, Steele must produce evidence from which "a rational factfinder could infer that the [employer] lied about its proffered reason for" the adverse action against the plaintiff. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.1994).

Plaintiff does not contend that she never had contacts with the Mayor prior to his taking office, nor does she argue that she and the Mayor are compatible. Had such an argument been presented, it would undoubtedly fail since it is the perception of the decision maker which is relevant, not Steele's perception of her employment situation. *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464–65 (7th Cir.1986). Instead, the essence of Steele's pretext argument, as stated by plaintiff's counsel during the December 2 hearing, is that the proffered reason is not the true reason for the Mayor's actions because when she was terminated she was not given a reason or explanation for the Mayor's action. She argues that even when she asked the Mayor why she was being terminated he gave her no response. This argument, however, necessarily fails.

An employer need not inform an employee of all possible reasons it may have for terminating an employee. *Wilson v. AM*

General Corp., 1996 WL 599373 at *14 (N.D.Ind.1996). "An employer need not anticipate all possible issues which might be raised in a later lawsuit, nor is an employer prohibited from sparing the employee the possible hurt that may be caused by its view of the employee's work quality." *Chu v. Samuel Geltman & Co.,* 1993 WL 492747 at *6 (E.D.Pa.1993). Further, an employer's silence regarding the reason for taking an employment action is insufficient to create an inference of pretext. *See Cavalieri–Conway v. L. Butterman Associates,* 992 F.Supp. 995 (N.D.Ill.1998) (applying rule to Fair Housing Act case where landlord provided no reason for decision to terminate tenant's lease and finding failure to provide a reason insufficient to show pretext); *see also, Wisniewski v. Ameritech,* 1996 WL 501737 (N.D.Ill. Sept.3, 1996) (the fact that employee was given no reason at the time of discharge insufficient to demonstrate pretext).

In this case, interpreting the silence of the employer as a pretext for discrimination would result in pure speculation and conjecture on the part of the plaintiff. Certainly unfounded personal beliefs, supposition and conjecture are legally insufficient to establish pretext. *Kizer v. Children's Learning Center,* 962 F.2d 608, 613 (7th Cir. 1992). Moreover, the argument that an employer's failure to provide a reason is insufficient to support a finding of pretext is particularly compelling where, as in this case, the employee is an employee at will. An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. *Allard v. Indiana Bell Telephone Co. Inc.,* 1 F.Supp.2d 898, 932 (S.D.Ind.1998). Thus, the fact that Steele was given no reason, when the law permits discharge for no reason, cannot, by itself, establish an inference of discrimination.

Finally, Steele produces no evidence of age animus, either directly or indirectly, on the part of the Mayor nor does she suggest any other evidence which would indicate that the proffered reason is a lie.[7] Considering the

---

7. In addition, Ellis testified in his deposition that upon terminating Steele, he offered the secretarial position to Ellen Wood who was allegedly older than Steele or "quite possibly over 60." (Ellis Dep. p. 30). According to Ellis, Wood did not take the job because she had retired. (Ellis

dearth of any other evidence suggesting that the given reason is pretextual the fact that Steele received no reason for her termination does not establish that the proffered reason is false and that discrimination was the true motive. Therefore, the court concludes that Steele has not presented sufficient evidence to warrant a jury trial on her age discrimination claim.

### III. ERISA Claims

 Finally, Steele contends that her termination nine months short of her expected vesting date in the PERF plan, constitutes benefits discrimination in violation of ERISA, § 510. Under § 510, Steele must produce evidence showing more than a loss of benefits or that, as a consequence of a legitimate employment action, she lost benefits. *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir.1998). Rather, she must ultimately establish that "the complained of action affecting her employment situation was taken by her employer with the specific intent of interfering with her benefit rights." *Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir.1994). That is, the plaintiff must ultimately show that "a desire to frustrate his attainment or enjoyment of benefit rights contributed toward the employer's decision." *Id.* The specific intent requirement, like intent in other discrimination cases, can be validated through either direct or circumstantial evidence. Steele presents no direct evidence to solidify her claim that Ellis intentionally sought to interfere with her vesting in PERF. Accordingly, for Steele to succeed with this claim, she must again navigate the waters of the *McDonnell–Douglas* burden shifting test. *Grottkau v. Sky Climber Inc.*, 79 F.3d 70, 73 (7th Cir.1996)

 Initially, Steele must establish that (1) she was a participant in a plan subject to ERISA;[8] (2) she was qualified for the position she held; and (3) she was discharged under circumstances giving rise to

an inference of discriminatory intent. *Grottkau v. Sky Climber Inc.*, 79 F.3d at 73. Steele contends that she meets the first two requirements; in contrast, the defendants, while not conceding these two requirements, argue that even assuming all the requirements are met, Steele cannot present facts which demonstrate a specific intent to discriminate. This court agrees.

Steele's only evidence to support a finding of specific intent or to give rise to an inference of discriminatory intent is that she notified Ellis in the termination meeting that she was close to vesting in PERF and would accept another job or take an unpaid leave of absence in order to vest. According to Steele, an inference arises that her termination was specifically intended to prevent her from vesting in PERF since Ellis denied her any opportunity for another position or for unpaid leave. Moreover, Steele points to discrepancies in Ellis's testimony, his filings with the court and the EEOC regarding the circumstances surrounding her termination as evidence of pretext. Specifically, Steele references the defendant's response to the EEOC position statement in which the City states:

> Within five days after taking office, Mayor Ellis met with Ms. Steele to discuss her 'employment situation.' Immediately upon being told what the meeting was about, Mrs. Steele requested that she be allowed to resign. The two parties determined the terms of her discontinued employment and Mrs. Steele left immediately. *While it is clear that Mrs. Steele would no longer have been employed as the secretary to the Mayor, had she not immediately resigned, she may have been placed in an alternate but comparable position within the administration. Once Mrs. Steele offered to resign, no offer of alternate employment was tendered or discussed.*

Steele also points to Ellis' deposition testimony and his responses to Requests for Admis-

---

Dep. p. 30). This fact further indicates the lack of an age-based animus on the part of the Mayor.

8. Steele argues that she can satisfy this requirement by showing that she is a member of a protected class. She then states that she fulfills the requirement by being over age 40. See

Plaintiff's Response Brief, p. 11. While this court does not deny that Steele is a protected person, it is not her age that is the determining factor for an ERISA claim. Rather, she is protected by virtue of her participation in an ERISA plan.

sions which contradict each other. Ellis' deposition states that he did not recall Steele asking for a transfer. However, in the answers to the Requests for Admission, Ellis admits that Steele asked for a transfer. These "shifting stories," Steele contends, support an inference that a specific intent to interfere with her benefits exist.

■ Although Steele raises an issue of fact as to whether the post-termination conversation occurred, the existence or non-existence of this conversation does not establish an inference of specific intent to discriminate. Accepting Steele's version of the facts as true, her request for transfer and the ensuing conversation regarding her proximity to vesting in PERF occurred after, albeit only minutes after, she was terminated. (Steele Dep. p. 22). There is no evidence before the court that Ellis utilized this knowledge in advance of his decision to terminate Steele or that it factored into his decision-making process in any respect. At most, Steele's evidence, taken most favorably to her, shows that Ellis learned after the adverse employment action that she was close to vesting and, nevertheless, chose not to transfer or reinstate her on an unpaid leave of absence. Any inferences drawn from this evidence cannot rise to the level necessary to show a "specific discriminatory intent," as required. ERISA does not mandate that an employer who has legitimate reasons for taking an adverse action against an employee, transfer the employee or accommodate her to ensure vesting in a pension plan. Rather, ERISA is merely designed to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir.1991). In this case, plaintiff fails to raise facts from which the court can draw an inference that Ellis specifically in-

tended to deny her pension benefits.[9] Thus, plaintiff cannot establish a claim under Section 510.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is hereby GRANTED.

---

9. Plaintiff's Response briefly mentions that Steele would have vested within 9 months had she not been discharged. Although it is widely held that temporal proximity of a plaintiff's discharge to vesting may be sufficient to support a prima facie case of discrimination, *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1044 (6th Cir.1992) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1117 n. 1 (2d Cir.1988)), plaintiff fails to make such an argument. However, even if such an argument had been made, the cases indicate that

9 months is too far removed from the employment decision to show specific intent. *Hendricks v. Edgewater*, 898 F.2d 385, 389 n. 3, (3d Cir.1990) (eleven month span between termination and vesting date insufficient to maintain prima facie requirements); *Lerner v. General Electric Co.*, No. 93–5787, 1995 WL 580041 (E.D.Pa.1995) (a fourteen month period of time did not support an inference that the discharge was motivated by discriminatory intent).